Kiiko NAKAHARA and Jean–
Paul Renoir, Plaintiffs,

v.

The NS 1991 AMERICAN TRUST,
a Delaware Business Trust,
Defendant,

v.

NIHON SANGYO KABUSHIKI KAISHA,
a Japanese Corporation, Defendant–
Intervenor.

No. 15905.

Court of Chancery of Delaware,
New Castle County.

Submitted: Sept. 14, 1998.
Decided: Sept. 28, 1998.

Edward M. McNally, Richard D. Kirk, and Nancy R. Walsh, of Morris, James, Hitchens & Williams, Wilmington, for Plaintiffs.

Stephen E. Jenkins, of Ashby & Geddes, Wilmington, for defendant.

David S. Eagle, of Klehr, Harrison, Harvey, Branzburg & Ellers, L.L.P., Wilmington; Glen A. Weiner, of Klehr, Harrison, Harvey, Branzburg & Ellers, L.L.P., Philadelphia, PA, for defendant-intervenor.

### OPINION ON REMAND

CHANDLER, Chancellor.

This case raises the novel question of whether a court of equity should permit a party to avoid the impact of their inequitable conduct by attempting to undo that conduct after an adverse verdict. For the reasons stated below, I deny the Plaintiffs Rule 60(b) motion and hold that Plaintiffs, who were previously denied equitable relief due to their own unclean hands,[1] did not successfully purge the taint of their inequitable actions. Therefore, I will not grant the relief from judgment that they now seek.

## I. BACKGROUND

The operative facts underlying the dispute are detailed at length in my earlier opinion in this case and as such I do not intend to repeat them here. Essentially, this controversy is centered around, among other things, rights of indemnification and advancement of litigation expenses in pending cases which may ultimately determine rightful ownership of the Empire State Building in New York City[2] (collectively, the "New York litigation").

Plaintiffs Kiiko Nakahara and Jean–Paul Renoir (collectively "Plaintiffs"), are the managing trustees of the nominal defendant The NS 1991 American Trust (the "American Trust"). Pursuant to an indemnification provision in the American Trust trust instrument, Plaintiffs sought the advancement of their litigation expenses in connection with defending the New York litigation. The American Trust has sought to remain neutral throughout and only seeks a judicial determination of the rights of the parties. Nihon Sangyo Kabushiki Kaisha ("NSKK"), a Japanese corporation, intervened on the ground that as a beneficiary of the American Trust's parent trust, the NS 1991 Trust (the "Isle of Man Trust")—the indirect owner of 100% of the American Trust—NSKK had a sufficient stake in any further distribution of assets for advancement of litigation expenses.[3]

In my earlier opinion, I held that Delaware's Business Trust Act permits business trusts to make advancements to their trustees. I further held that Plaintiffs satisfied all prerequisites imposed by the advancement provision of the American Trust's governing instrument. But, because I found that Plaintiffs suffered from unclean hands, I did not authorize the payment of advancements in this case.[4]

In light of the unclean hands doctrine, my decision to hold against the Plaintiffs turned on, among other things, the fact that Plaintiffs acted in bad faith and in violation of a

---

1. *Nakahara, et al. v. The NS 1991 American Trust,* C.A. No. 15905, Chandler, C. (Mar. 20, 1998) (prior opinion) (hereinafter *"Nakahara"*).

2. *Nippon Sangyo Co. Ltd. v. Nakahara, et al.,* Index No. 94/130874 (Sup.Ct.N.Y.County) (the "NSKK litigation") and *Empire State Building Associates, et al. v. Trump, et al.,* Index No. 95/113519 (Sup.Ct.N.Y.County) (the "Empire State litigation").

   Facts pertinent to this action and at the center of those cases are reviewed in my earlier opinion. *See Nakahara* at 1–13 ("Central to the NSKK litigation is the question whether Hideki Yokoi ..., principal shareholder of the Japanese corporation Nihon Sangyo Kabushiki Kaisha ("NSKK"), gave Nakahara, his daughter and director of NSKK, $40 million to purchase the

Empire State Building for NSKK as part of a business transaction or whether the $40 million was simply a gift from father to daughter.").

3. *See id.* at 3 ("NSKK accuses Nakahara of breach of fiduciary duty, alleging that she improperly used a power of attorney to fraudulently transfer property belonging to NSKK into an offshore trust system of which Nakahara is the principal beneficiary.")

4. As I emphasized in my earlier opinion, although *advancement* of litigation expenses will not be forthcoming in this case, Plaintiffs may ultimately be entitled to indemnification at some later point. *Id.* at 57.

standstill agreement[5] by withdrawing from the American Trust the monies they sought as advances for pending New York litigation expenses. In addition, I felt that those withdrawals, and their timing in particular,[6] were an attempt to "preempt any judicial determination"[7] regarding the Isle of Man Trust trustee's—the Abacus Trust Company ("Abacus")—authority to make the requested advancements. In short, Plaintiffs "withdrew the $200,000 and $700,000 wrongfully, without permission, and surreptitiously."[8]

After I entered the Order in this case denying Plaintiffs their requested relief, a rather interesting turn of events ensued. Over a month after my ruling, Plaintiffs took it upon themselves to return the sum of $900,000 to the American Trust—exactly the amount of money that they had improperly withdrawn. On the basis of this action alone Plaintiffs now seek Rule 60(b) relief from prior judgment.

## II. LEGAL ANALYSIS

### A. Rule 60(b)

Plaintiffs' motion cites Court of Chancery Rule 60(b) as the basis for their present claim. As Plaintiffs do not allege any mistake, newly discovered evidence, fraud or satisfaction, I assume that subsections (b)(1), (2), (3), (4) & (5) do not apply.[9] After oral argument, it is clear that Plaintiffs' motion is based on Rule 60(b)(6) as that subsection

provides a basis for relief for "any other reason justifying relief from the operation of the judgment."

A motion for relief from judgment under paragraph (b) of Rule 60 contemplates the prudent exercise of judicial discretion.[10] The rule should not serve as a substitute for a motion for new trial or for an appeal from a final judgment.[11] "Thus, relief under paragraph (b) is not available to a party who received an adverse judgment, then elected not to seek a new trial nor to appeal from the final judgment."[12] Under subsection (b)(5) the standard for granting relief is a showing that, if unchanged, the prior judgment will work manifest injustice on the moving party.[13] The standard under (b)(6) is the "extraordinary circumstances" test as set forth in Delaware decisional law.[14]

In support of their motion Plaintiffs give the Court absolutely no guidance as how their position either avoids manifest injustice or proof that theirs is a case of extraordinary circumstances. Plaintiffs point out that this is an unusual case and by virtue of that fact alone the circumstances here should be considered "extraordinary".[15] Unfortunately for Plaintiffs, this is not the strongest argument. In light of my findings of fact which included bad faith and knowingly improper conduct on behalf of the Plaintiffs, the fact that this case presents a seemingly novel issue of law in Delaware does not by itself merit the desig-

---

**5.** The standstill agreement was an agreement made by Plaintiffs wherein they agreed not to engage in any transactions on behalf of the American Trust without the consent of the American Trust's parent trust.

**6.** *Id.* at 53–55.

**7.** *Id.* at 52.

**8.** *Id.* at 55.

**9.** Plaintiffs may have attempted to proceed under subsection (b)(5) in light of the language in that section which provides relief if "it is no longer equitable that the judgment should have prospective application."

**10.** *Wife B v. Husband B*, Del.Supr., 395 A.2d 358 (1978).

**11.** *Dixon v. Delaware Olds, Inc.*, Del.Supr., 405 A.2d 117 (1979).

**12.** *TV58 Limited Partnership v. Weigel Broadcasting Co.*, Del.Ch., C.A. No. 10798, at 2, Chandler, V.C., 1994 WL 114809 (Mar. 23, 1994).

**13.** *Id.*

**14.** *See Jewell v. Division of Social Services*, Del. Supr., 401 A.2d 88 (1979); *Keith v. Melvin L. Joseph Construction Co.*, Del.Super., 451 A.2d 842 (1982); *Campbell v. Campbell*, Del.Supr., 522 A.2d 1253, 1254 (1987) (applying the equivalent Superior Court rule); *See also Hoffman v. Hoffman*, Del.Supr., 616 A.2d 294, 297 (1992); Moore's Federal Practice, ¶ 60.48, *et seq.* (3d ed.1998); 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure, § 2864, *et seq.* (1995).

**15.** Pls.' Rep.Br. at 4.

nation of "extraordinary circumstances." In any event, it certainly does not automatically raise the suspicion of manifest injustice.

Plaintiffs' logic is simple and is as follows: if the basis for my denial of Plaintiffs' requested relief was the acts of improper withdrawals of money, then if they give the money back they should now be entitled to that relief. So, Plaintiffs must be heard to say that the act of returning the previously improperly withdrawn money is the new fact or circumstance that merits the reconsideration of my prior judgment under Rule 60(b).[16] Plaintiffs' logic proves too simple.

■ Any acts done by Plaintiffs *after* judgment do not change the fact that their conduct was inequitable—thereby dirtying their hands—at the time this case was originally under consideration. In other words, the new facts here do not change the old facts. Plaintiffs still acted in bad faith, "underhanded[ly]," in a manner "deserving *condemnation*,"[17] "wrongfully, without permission, and surreptitiously"[18] with an aim at subverting the judicial process when they first sought relief from a court of equity. Regardless of their later actions, Plaintiffs nonetheless *came* to this Court with unclean hands and *remained* in front of the Court with unclean hands *even after final judgment*.[19] While Plaintiffs' action of giving the money back might be considered extraordinary in a colloquial sense, as it does not change the way I view their original transgressions[20] it does not fall within the ambit of Rule 60(b)(6).

A recitation of the practical effect of what Plaintiffs ask me to do dismisses any lingering doubt. Suppose that I were to accept Plaintiffs' logic. In that case, by returning the $900,000 I would have to grant consideration of Plaintiffs' claims to a right of advancement based on the merits of their case. And, since I already decided in my earlier opinion that Plaintiffs would have otherwise been entitled to succeed on their advancement claims,[21] ultimately, Plaintiffs would receive at least the $900,000 in addition to any other appropriate advancements for litigation costs. In effect, Plaintiffs would return the money with one hand and then reach out to take it right back with the other. Effectively, Plaintiffs now seek to avoid all consequences of their inequitable actions.

■ In response Plaintiffs might be heard to say that if the state of affairs after repayment is where it should have been initially and, if matters had been in good order, and since they would have received the monies they now seek, then to deny them the opportunity to succeed on the merits is fundamentally inequitable. In addition to being insufficient at addressing their prior misconduct, as explained below, Plaintiffs' act of returning the money is a testament to their misunderstanding of the nature of the doctrine of unclean hands. The doctrine of unclean hands functions to promote and protect courts of equity notwithstanding the fact that the doctrine may act as a bar to a review of the case on the merits.[22]

---

16. *Campbell v. Campbell,* Del.Supr., 522 A.2d 1253, 1254 (1987) (concluding that a judgment "should not be revisited simply because there is a post judgment change in circumstances. Even the all-encompassing language of Rule 60(b)(6) does not contemplate that result."); *see also Bachtle v. Bachtle,* Del.Supr., 494 A.2d 1253, 1256 (1985) (refusing to open judgment under Rule 60(b)(6) to amend property valuation after post-judgment sale of property).

17. *Nakahara* at 55.

18. *Id.* at 55

19. While I am aware of controlling authority which requires litigants to come to equity with clean hands and to maintain clean hands throughout the litigation, *see, e.g., Bodley v. Jones,* Del.Supr., 59 A.2d 463, 469 (1947), it would certainly be contradictory for me to create precedent undermining the unclean hands doctrine in a case where Plaintiffs' hands were "dirty" when they came to the Court for relief, remained so throughout the length of the litigation, and only *after* adverse judgment did they seek to purge the taint.

20. "Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim by the chancellor." *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 815, 65 S.Ct. 993, 89 L.Ed. 1381 (1945).

21. *Nakahara* at 30–47.

22. Plaintiffs can hardly be heard to complain too loudly—in this case Plaintiffs did not face as harsh a consequence. In fact, there was a trial

## B. Doctrine of Unclean Hands

The maxim of equity that "[he] who comes into equity must do so with clean hands"[23] dates back to the late eighteenth century when it was gleaned by a British barrister from a collection of cases in which plaintiffs had been denied relief on the basis of their inequitable conduct.[24] While the doctrine might be considered relatively new in light of the long history of maxims of equity it is well embedded in American jurisprudence.[25]

The unclean hands doctrine is aimed at providing courts of equity with a shield from the potentially entangling misdeeds of the litigants in any given case. The Court invokes the doctrine when faced with a litigant whose acts threaten to tarnish the Court's good name. In effect, the Court refuses to consider requests for equitable relief in circumstances where the litigant's own acts offend the very sense of equity to which he appeals. As former Vice Chancellor Brown aptly put it,

[T]he purpose of the clean hands maxim is to protect the public and the court against misuse by one who, because of his conduct, has forfeited his right to have the court consider his claims, *regardless of their merit.*[26] (Emphasis added.)

Thus, the doctrine should not be seen as a means to aid a party who faces an unscrupulous opponent; "rather it is a rule of public policy."[27]

While it is true that cases turning on matters related to unclean hands are infrequent as a matter of course, that infrequency has little to do with the lack of judicial power to invoke the doctrine. In fact, the decisional authority is almost universal in its acceptance that courts of equity have extraordinarily broad discretion in application of the doctrine. The most oft-cited statement of the applicable standard is the United States Supreme Court's opinion in *Keystone Driller Co. v. General Excavator Co.*,[28] where Justice Butler stated "[in consideration of unclean hands, courts] are not bound by formula or

on the merits. Thus, I did not even exercise the full litany of responses available at my discretion.

23. *Kousi v. Sugahara*, Del.Ch., C.A. No. 1156, at 3, Jacobs, V.C., 1991 WL 248408 (Nov. 21, 1991).

24. William J. Lawrence, *The Application of the Clean Hands Doctrine in Damage Actions*, 57 Notre Dame Law 673, at n. 40 (1982) (citing Z. Chafee, *Some Problems of Equity* 8–9 (1950)). For a brief, slightly more modern, historical discussion of the doctrine *see Electrical Research Products, Inc. v. Vitaphone Corp.*, Del.Supr., 171 A. 738, 748–52 (1934).

25. *See, e.g., Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 64 S.Ct. 622, 88 L.Ed. 814 (1944); *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933); *Deweese v. Reinhard, et al.*, 165 U.S. 386, 17 S.Ct. 340, 41 L.Ed. 757 (1897); *Bishop v. Bishop*, 3d Cir., 257 F.2d 495 (1958), *cert. denied, Dreis v. Bishop*, 359 U.S. 914, 79 S.Ct. 578, 3 L.Ed.2d 576 (1959); *Gaudiosi, et al. v. Mellon, et al.*, 3d Cir., 269 F.2d 873 (1959), *cert. denied, Gaudiosi v. Mellon*, 361 U.S. 902, 80 S.Ct. 211, 4 L.Ed.2d 157 (1959); *Goldstein v. Delgratia Corp.*, S.D.N.Y., 176 F.R.D. 454 (1997); *Aris–Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*, S.D.N.Y., 792 F.Supp. 969 (1992), *aff'd, Aris–Isotoner Gloves, Inc. v. Berkshire Fash-*

*ions, Inc.*, 2d Cir., 983 F.2d 1048 (1992); *Judah, et al. v. Shanghai Power Co.*, Del.Supr., 546 A.2d 981 (1988); *Derickson v. Derickson*, Del.Supr., 281 A.2d 487 (1971); *Belle Isle Corp., et al. v. Corcoran, et al.*, Del.Supr., 49 A.2d 1 (1946); *Eastern States Petroleum v. Universal Oil Products Co.*, Del.Supr., 8 A.2d 80 (1939); *Electrical Research Products, Inc. v. Vitaphone Corp.*, Del. Supr., 171 A. 738 (1934); *see also* 27A Am.Jur.2d *Equity* §§ 125–136 (1996); Henry L. McClintock, *Handbook of the Principles of Equity* § 26 (2d ed.1948) (hereinafter "McClintock"); John N. Pomeroy, *Equity Jurisprudence* §§ 397–404 (5th ed.1941) (hereinafter "Pomeroy").

26. *Skoglund, et al. v. Ormand Industries, Inc.*, Del.Ch., 372 A.2d 204, 213 (1976); *see also Deweese v. Reinhard, et al.*, 165 U.S. 386, 390, 17 S.Ct. 340, 41 L.Ed. 757 (1897) ("A court of equity acts only when and as conscience commands; and, if the conduct of the plaintiff be offensive to the dictates of natural justice, then, whatever may be the rights he possesses, and whatever use he may make of them in a court of law, he will be held remediless in a court of equity.").

27. *Skoglund* at 213 (citation omitted).

28. 290 U.S. 240, 246, 54 S.Ct. 146, 78 L.Ed. 293 (1933); *see also Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 815, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) ("This maxim necessarily gives wide range to the

restrained by any limitation that tends to trammel the free and just exercise of discretion." [29] Presumably, courts in Delaware are governed by the same wide latitude. [30]

■ While extensive, the discretion of the Court is by no means absolute. Doctrinally there are a number of limitations on the application of the maxim. For instance, in order for the doctrine to apply in the first place the improper conduct must relate directly to the underlying litigation. [31] The standard, as applied by the Court of Chancery, is that the inequitable conduct must have an "immediate and necessary" relation to the claims under which relief is sought. [32] To operate otherwise would invite courts to act in a constabulary rather than judicial capacity. [33] In addition, some courts have held that the inequitable behavior attributable to the unclean litigant must be directed

at, or be the concern of, an interested party (as opposed to any third party). [34]

■ The greatest limitation on the doctrine is the widely accepted exception that since it is ultimately based on public policy, countervailing public policy which points in the direction of reaching the case on the merits can preclude its operation. [35] In other words, a stronger public policy may be at work giving the unclean litigant fortuitous reprieve from the doctrine's otherwise potentially preclusive effect. As one astute commentator put it "[t]he doctrine should not be invoked when the only party losing is the public." [36]

■ Ultimately, in deciding whether a party has forfeited its right to be heard, the Court "must examine the particular transac-

equity court's use of discretion in refusing to aid the unclean litigants") (citing *Keystone* ).

29. *Keystone* at 246, 54 S.Ct. 146. In attempting to crystallize the most appropriate inquiry in these cases the Third Circuit, in the case of *Bishop v. Bishop*, 3d Cir., 257 F.2d 495 (1958), cert. denied, *Dreis v. Bishop*, 359 U.S. 914, 79 S.Ct. 578, 3 L.Ed.2d 576 (1959), reasoned that it is "the moral intent of the [litigant] in such a case ... rather than any actual injury done, which determines whether he has come into court with clean hands." *Id.* at 501 (citations omitted).

30. *See Electrical Research Products, Inc. v. Vitaphone Corp.*, Del.Supr., 171 A. 738, 749 (1934) (liberally and generally citing *Keystone*, its predecessors and progeny in accord); *see also Goldstein v. Delgratia Corp.*, S.D.N.Y., 176 F.R.D. 454 (1997); *Aris–Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*, S.D.N.Y., 792 F.Supp. 969 (1992), aff'd, *Aris–Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*, 2d Cir., 983 F.2d 1048 (1992).

31. *Walter v. Walter*, Del.Supr., 136 A.2d 202 (1957); *Eastern States Petroleum v. Universal Oil Products Co.*, Del.Supr., 8 A.2d 80, 82 (1939); see also Pomeroy, § 399 at 95 ("[the doctrine] does not extend to any misconduct, however gross, which is unconnected with the matter in litigation, and with which the opposite party has no concern.").

32. *See, e.g., Kousi v. Sugahara*, Del.Ch., C.A. No. 1156, at 3, Jacobs, V.C., 1991 WL 248408 (Nov. 21, 1991).

33. *See* Pomeroy, § 399 at 95–97 ("A court of equity is not an avenger of wrongs committed at large by those who resort to it for relief, however careful it may be to withhold its approval from

those which are involved in the subject-matter of the suit ...").

34. *See Adams v. Manown*, 328 Md. 463, 615 A.2d 611, 616 (1992) ("Thus, an important element of the clean hands doctrine is that the alleged misconduct must be connected with the transaction upon which the claimant seeks relief."); *see also* 27A Am.Jur.2d *Equity* § 133 at 613–14 (1996).

35. *See, e.g., Judah, et al. v. Shanghai Power Co.*, Del.Supr., 546 A.2d 981, 989 (1988) (refusing to apply the doctrine of unclean hands stating, "[s]tate policies incorporating equitable principles which would thwart changes in the foreign policy are invalid...."); *Belle Isle Corp., et al. v. Corcoran, et al.*, Del.Supr., 49 A.2d 1, 4 (1946) ("public policy of the State ... will not be disturbed by the application of [the unclean hands] doctrine."); *Sheridan v. Sheridan*, N.J.Super., 247 N.J.Super. 552, 589 A.2d 1067, 1075 (1990) ("Since the clean-hands doctrine is based on public policy, it may be relaxed under the appropriate circumstances or as interests of fairness require."); *see also Novadel-Agene Corp. v. Penn*, 5th Cir., 119 F.2d 764 (1941) (holding that in the context of patent litigation the doctrine of unclean hands falls in the face of counterweighing public policy in support of enforcement of patent rights); *see generally* Howard W. Brill, *The Maxims of Equity*, 1993 Ark L. Notes 29, 37 (stating that "[p]ublic policy may override the unclean hands doctrine" and that "[i]n anti-trust, copyright, communication, and patent cases the courts have concluded that legislative policy and public interest demand that the action be heard despite the actions of the plaintiff.") (citations omitted).

36. Brill, *The Maxims of Equity, supra.*

tions and circumstances involved ... which are alleged to taint [the subject of the suit]." [37]

### C. Application of the Doctrine to the Present Case

Unfortunately for Plaintiffs, my judgment remains unchanged even in light of the recent developments (i.e., plaintiffs return of the money). The analysis in my prior opinion addresses the very issues that the doctrine requires: 1) I already found that the unfortunate conduct was "immediately and necessarily" related to the underlying litigation; [38] 2) that conduct directly affected the other parties to the litigation; [39] 3) and as I have already mentioned, there were specific findings of fact that point to intentional improper conduct and the willful disregard for judicial proceedings.[40] The only question that might remain is whether or not there is a public policy consideration that would merit exception from the maxim's operation.

### D. Public Policy and Related Incentive Effects

Plaintiffs submit only one contention that might arguably qualify as a public policy concern. Appealing to almost religious principles, Plaintiffs' request that I adopt a rule that would permit a wrongdoer to redeem himself—even after reprimand—with the hope of encouraging good conduct in the long term. Thus, in the name of sound public policy, Plaintiffs would have me decide to allow a form of atonement for their past misdeeds in order to create incentives for similar redemption in future cases that arise under the unclean hands doctrine. To paraphrase Plaintiffs' counsel's argument—the question is whether this Court should adopt a rule whereby if someone takes money inequitably the Court should allow them to put the money back and suffer no consequence.

To be sure, Plaintiffs' proposal will have incentive effects. Undoubtedly, if I were to import such a rule into Delaware law litigants that were denied relief due to their own unclean hands would attempt to wash the stain of their inequitable actions. Why not? What would they have to lose? It is precisely that analysis that I want to avoid.

Those who have concerned themselves with courts' forward-looking tendencies take much time in their discussions to theorize about so-called "incentive-compatible" legal rules.[41] In the present context, such a discussion would ask at what point should litigants be presented with the opportunity to avoid the consequence of their inequitable conduct. Under Plaintiffs' theory that opportunity should come as late as after an adverse final judgment has been entered and while the case is on appeal. In effect, Plaintiffs would permit litigants the luxury of making their decisions ex post, i.e., after they know of the court's adverse reaction to their inequitable actions.[42]

---

**37.** Johnson v. Yellow Cab Co., 321 U.S. 383, 387–88, 64 S.Ct. 622, 88 L.Ed. 814 (1944).

**38.** Nakahara at 50.

**39.** Id. at 51–52.

**40.** Id. at 49.

**41.** See, e.g., Edward B. Rock and Michael L. Wachter, The Enforceability of Norms and The Employment Relationship, 144 U.Pa.L.Rev.1913 (1996) (commenting that in the context of labor markets optimal results ensue, i.e., parties are given the best incentives when costs and risks are analyzed ex ante as opposed to ex post.); see generally Richard A. Posner, Economic Analysis of Law, 8, 24, 266, 348, 401, 405, 522, 633 (4th ed.1992) (comparing ex ante vs. ex post analysis); A. Mitchell Polinsky, An Introduction to Law and Economics 130–32 (2d ed.1989) (discussing incentives generally).

**42.** In my review of the cases in this area, all of the cases in which the court allowed a party to purge their formerly unclean hands were in situations where the cure occurred before final judgment. See, e.g., General Elec. Co. v. Hess Bros., Inc., E.D.Pa., 155 F.Supp. 57, 64 (1957) (new purchase plan instituted prior to close of record alleviated plaintiff's prior inequitable conduct); Stewart v. Jackson, Ind.App., 635 N.E.2d 186 (1994) (plaintiffs purged themselves of unclean hands by disengaging in the operation of a home business in violation of a restrictive covenant, and could consequently seek injunction against a neighbors' operation of a child care center). Since those facts are not before me, I specifically reserve judgment on the question whether, under Delaware law, a party may purge the taint of unclean hands prior to the entering of an adverse final judgment.

In my opinion the more sound public policy would encourage litigants to avoid the taint of unclean hands *ex ante, i.e.,* from the outset. In other words, by disallowing litigants to purge their unclean hands *after* an adverse final judgment, courts create incentives to either 1) not engage in bad acts in the first place; or 2) at the very least encourage an attempt to cure the bad acts before final judgment.

As suggested, on the margin Plaintiffs' proposal could create perverse incentives. Under Plaintiffs' theory there is nothing to keep a litigant from going through the analysis that the risk of questionable conduct being considered unclean is worth taking because any adverse impact might simply be neutralized by attempting to undo that conduct after final judgment. Thus, under Plaintiffs' approach to the issue, less-than-scrupulous litigants will take the chance of an adverse judgment, knowing they will be able to reverse the outcome *ex post.* This is hardly a system where equitable conduct is encouraged in the long term. I am unwilling to create an effective option for litigants to fall prey to inequitable tendencies.

The parties before me, and future litigants generally, would be ill-served if they considered my opinion in this case merely as some sort of exercise in judicial morality. My view is intended to have the *specific effect* of dissuading future parties from engaging in acts of questionable legality on the thought that if the Court ultimately rules against them on the merits their questionable acts will be neutralized. I do not intend to deter litigants who have a good faith belief in the rightfulness of their actions and have a plausible claim in law or equity from taking aggressive litigation strategies. Here, however, the facts clearly showed bad faith and a willful attempt to subvert the judicial process by Plaintiffs. In my view, the long-term confidence in the integrity of the judicial process as well as the effective administration of courts, precludes judges who sit in equity from appearing to countenance such inequitable conduct.

## III. CONCLUSION

Once the doctrine of unclean hands is properly understood in the context of protecting the integrity of the Court, it flows logically that here the "cure" fails to remedy the "wrong." The subterfuge, by which the Plaintiffs seized monies knowing all the while that the Delaware Court of Chancery was the proper forum to adjudicate the Plaintiffs' legal right to the monies, is not vitiated by the repayment. Parties must be held accountable for their inequitable conduct.

For the reasons stated above, I find in favor of NSKK, and deny Plaintiffs' motion for relief from prior judgment.

IT IS SO ORDERED.

