**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

INTEAM ASSOCIATES, LLC, a Delaware limited liability company, as successor-in-interest to SL-TECH TECHNOLOGIES, INC., a Delaware corporation,

      Plaintiff,

      v.

HEARTLAND PAYMENT SYSTEMS, LLC,

      Defendant.

HEARTLAND PAYMENT SYSTEMS, LLC,

      Counterclaim Plaintiff,

      v.

LAWRENCE GOODMAN, III and INTEAM ASSOCIATES, LLC,

      Counterclaim Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 11523-VCMR

## ORDER CRAFTING REMEDY FOLLOWING REMAND

WHEREAS, on September 30, 2016, this Court issued a post-trial memorandum opinion in the instant case;

WHEREAS, on August 17, 2017, the Delaware Supreme Court issued an opinion affirming in part and reversing in part this Court's opinion;

WHEREAS, the Supreme Court "remand[ed] the case to the Court of Chancery to exercise its broad discretion to craft a remedy" consistent with its opinion;

NOW, THEREFORE, THE COURT HEREBY FINDS AND ORDERS AS FOLLOWS:

1. I have reviewed the parties' briefs, supporting submissions, and the applicable law.

2. I detail only the facts necessary to craft a remedy pursuant to the Supreme Court's instruction. [1] For a full recounting of the events leading up to this case, see *Heartland Payment Systems, LLC v. inTEAM Associates, LLC*, 171 A.3d 544 (Del. 2017).

3. Heartland Payment Systems, Inc. ("Heartland") is a credit card payment processor for industries including K-12 schools. Tr. 611-12 (Lawler). Additionally, Heartland produces computer software to manage school meal programs for the K-12 foodservice industry. *Id.* In September 2011, Heartland

---

[1] Citations to testimony presented at trial are in the form "Tr. # (X)" with "X" representing the name of the speaker. Citations to the transcript of the oral argument on remand are in the form "Oral Arg. Tr. #." After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Dr." No disrespect is intended. Joint Trial Exhibits are cited as "JX #." Facts drawn from the parties' Joint Pre-Trial Stipulation and Order are cited as "PTO ¶ #." Unless otherwise indicated, citations to the parties' briefs are to remand briefs.

entered into a purchase agreement (the "Asset Purchase Agreement") to acquire the assets of School Link Technologies, Inc. ("SL-Tech"), a producer of computer software for food service operations management. JX 25. The Asset Purchase Agreement excluded one division of SL-Tech from the acquisition, a consulting business spun off to create inTEAM Associates, LLC ("inTEAM"). *Id.* at Ex. A, at A-4; *Id.* at Ex. M. Lawrence Goodman, III, SL-Tech's former CEO, became CEO of inTEAM. PTO ¶ III.A.3.

4.  The parties executed two additional agreements concurrent with the Asset Purchase Agreement. A co-marketing agreement (the "Co-Marketing Agreement") granted Heartland and inTEAM the right to market one another's products. JX 23 § 2.1. Under a consulting agreement (the "Consulting Agreement"), Goodman served as a strategic advisor to Heartland in exchange for a monthly salary. JX 22 ¶¶ 1, 3. The Asset Purchase Agreement, Co-Marketing Agreement, and Consulting Agreement each contain non-compete provisions. The Asset Purchase Agreement states that "[f]or a period of five (5) years from and after the Closing Date, neither [SL-Tech] nor [Goodman] will engage directly or indirectly . . . in providing any Competitive Services or Products or any business that School-Link conducts as of the Closing Date in any of the Restricted Territory." JX 25 § 5(n). The Co-Marketing Agreement states that "inTEAM shall not engage, directly or indirectly, on its own behalf or as a principal or representative of any person, in

3

providing any services or products competitive with the HPS Business." JX 23 § 9.1.1(B). It also states that "[Heartland] shall not engage, directly or indirectly . . . in providing any services or products competitive with the inTEAM Business . . . ." *Id.* § 9.1.1. The Consulting Agreement states:

> [Goodman] shall not directly or indirectly, on behalf of himself or on behalf of any other person, firm or business entity: (i) become an owner of any outstanding capital stock, or a member or partner, of any company, partnership, or entity that engages in Competitive Business within the Restricted Territory; or (ii) perform or provide any services, whether as an employee, owner, consultant or otherwise, to, for or on behalf of any company, partnership, or entity that engages in Competitive Business within the Restricted Territory, if such services are the same or similar in character to the services performed or provided by [Goodman] to Heartland pursuant to this Agreement.

JX 22 ¶ 11(a).

5. Despite the multitude of non-compete provisions, each of the parties began taking competitive actions. "inTEAM developed a new software program module . . . with overlapping capabilities with" an SL-Tech software program acquired by Heartland. *Heartland*, 171 A.3d at 546. "Goodman tried to solicit one of Heartland's customers. Heartland paired with one of inTEAM's biggest competitors to submit a bid to provide software to the Texas Department of Agriculture." *Id.*

4

6. The parties subsequently brought claims and counterclaims in the Court of Chancery, with inTEAM seeking to enjoin Heartland's actions and Heartland seeking to enjoin the behavior of inTEAM and Goodman. *inTEAM*, 2016 WL 5660282, at *1. Following a four-day trial, this Court held that Heartland breached its non-compete obligations under the Co-Marketing Agreement, *id.* at *17, but that neither inTEAM nor Goodman violated any non-compete provisions. *Id.* at *14, *23. This Court also held that Goodman violated certain non-solicitation obligations contained in the Consulting Agreement. *Id.* at *25. This Court enjoined Heartland from engaging in competitive activities from September 30, 2016 to March 21, 2018, *id.* at *27, and ordered Goodman to disgorge his consulting fees from "July, August, and September 2014, totaling $50,003.01" due to his breach of the non-solicitation obligations contained in the Consulting Agreement. *Id.* at *28.

7. On appeal, the Supreme Court affirmed that "Heartland breached its contractual obligations by collaborating with an inTEAM competitor, and Goodman breached by soliciting a customer of Heartland." *Heartland*, 171 A.3d at 547. Further, the Supreme Court noted that the Court of Chancery "did not abuse its discretion . . . [in the] assessed damages against Goodman." *Id.* The Supreme Court, however, "reverse[d] the Court of Chancery's finding that Goodman and inTEAM did not breach their non-compete obligations under the various agreements," holding instead that Goodman and inTEAM each breached their non-compete obligations in

5

2012. *Id.* The Supreme Court "remand[ed] the case to the Court of Chancery to exercise its broad discretion to craft a remedy sufficient to compensate Heartland for Goodman's and inTEAM's breaches of the transaction documents." *Id.* The Supreme Court also noted that the Court of Chancery may "consider certain affirmative defenses . . . [that were] properly raised and briefed . . . at trial [which] the Court of Chancery did not reach . . . because it found no violation" of the non-compete obligations by inTEAM and Goodman. *Id.* at 572.

8.      On remand, the parties primarily seek injunctive relief to enforce the contractual non-compete provisions against each other. Heartland seeks to (i) vacate the standing injunction against it and (ii) enjoin inTEAM and Goodman from selling competing products. Def.'s Opening Br. 9. inTEAM asks the Court to let the existing injunction against Heartland stand. Pl. & Countercl. Def.'s Answering Br. 39. Both parties raise the affirmative defense of unclean hands. Def.'s Opening Br. 12; Pl. & Countercl. Def.'s Answering Br. 23. I agree and conclude that the doctrine of unclean hands bars either party from receiving the equitable relief of an injunction. *See, e.g.*, *Alpha Builders, Inc. v. Sullivan*, 2004 WL 2694917, at *2 (Del. Ch. Nov. 5, 2004) ("A request for injunctive relief clearly constitutes equitable relief over which this Court has jurisdiction.").

9.      "[H]e who comes into equity must come with clean hands." *In re Silver Leaf, L.L.C.*, 2005 WL 2045641, at *11 (Del. Ch. Aug. 18, 2005) (alteration in

6

original) (quoting *Bodley v. Jones*, 59 A.2d 463, 469 (Del. 1947)). "When one [who] files a bill of complaint seeking to set the judicial machinery in operation and to obtain some remedy has violated conscience or good faith or other equitable principles in his conduct, then the doors of the court of equity should be shut against him." *Id.* (alteration in original) (quoting *Bodley*, 59 A.2d at 469). "[T]he unclean hands doctrine is aimed at providing courts of equity with a shield from the potentially entangling misdeeds of the litigants in any given case." *Id.* at *12 (alteration in original) (quoting *Merck & Co. v. SmithKline Beecham Pharms. Co.*, 1999 WL 669354, at *45 (Del. Ch. Aug. 5, 1999)).

10. The Court "has broad discretion in determining whether to apply the doctrine of unclean hands." *SmithKline Beecham Pharm. Co. v. Merck & Co.*, 766 A.2d 442, 448 (Del. 2000). The Court is "not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 522-23 (Del. Ch. 1998) (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245-46 (1933)). "But the Court's discretion is not completely unlimited." *McKenna v. Singer*, 2017 WL 3500241, at *14 (Del. Ch. July 31, 2017). For the Court to apply the doctrine of unclean hands, the inequitable conduct of the party against whom unclean hands is being applied "must have an 'immediate and necessary' relation to the claims under which relief

7

is sought." *Nakahara*, 718 A.2d at 523 (citing *Kousi v. Sugahara*, 1991 WL 248408, at *2 (Del. Ch. Nov. 21, 1991)).

11.    Goodman and inTEAM began breaching their respective non-compete obligation in 2012. *Heartland,* 171 A.3d at 547. Heartland began breaching its non-compete obligations in 2014. *Id.* at 571. Moreover, the parties each took steps to conceal their respective violations from each other. For instance, in an email from November 11, 2012, an inTEAM nutritional consultant stated that "we can't be straight up . . . because that would be invading [Heartland's] territory!" *Id.* at 568 n.90. inTEAM's former Chief Operations Officer also wrote an email to the company's vice president of operations stating "you know [we're] basically developing a competing product with [Heartland] now," *id.* at 554, a view that inTEAM never shared with Heartland. Similarly, "Heartland teamed with Colyar[, a direct competitor to inTEAM,] to provide the same functionality that the Asset Purchase Agreement and the Co-Marketing Agreement reserve[d] for inTEAM" in a bidding process in Texas, *inTEAM*, 2016 WL 5660282, at *18, but only revealed its actions to inTEAM after losing the bidding process eighteen months later. *Heartland*, 171 A.3d at 555.

12.    Heartland and inTEAM seek equitable relief from the Court in the form of injunctions enforcing non-compete obligations. And "[b]oth parties argue that the other's claims should be barred by the doctrine of unclean hands." *In re Silver*

8

*Leaf*, 2005 WL 2045641, at *12. Both parties, Heartland and inTEAM, violated their own respective non-compete obligations and went to great lengths to hide the competitive actions from the other side.[2] The inequitable conduct of Heartland and inTEAM has an "'immediate and necessary' relation to the claims under which relief is sought." *Nakahara*, 718 A.2d at 523 (citing *Kousi*, 1991 WL 248408, at *2). The Court will not enforce non-compete obligations where the party seeking such injunctive relief surreptitiously violated its own non-compete obligations and instead will avoid the "entangling misdeeds of the litigants." *In re Silver Leaf*, 2005 WL 2045641, at *12 (quoting *Merck*, 1999 WL 669354, at *45). Thus, I vacate the injunction against Heartland, decline to issue a new injunction against Heartland, and decline to enjoin inTEAM or Goodman from their respective behaviors.

13. In addition to injunctive relief, Heartland also seeks monetary damages against Goodman for breach of the Asset Purchase Agreement and Consulting Agreement. The Court of Chancery found, and the Supreme Court affirmed, that Goodman should pay Heartland $50,003.01 as compensation for his breach of certain non-solicitation obligations in the Consulting Agreement. *Heartland,* 171 A.3d at 571. Now, Heartland asks that the Court order Goodman to pay back "each

---

[2] To the extent my prior opinion stated that inTEAM did not have unclean hands, *inTEAM*, 2016 WL 5660282, at *23, that ruling relied heavily on my finding that inTEAM did not breach its non-compete obligations. The Supreme Court reversed that finding, and so I must reexamine the argument, as I have done here.

9

and every benefit Goodman received from inTEAM while it was operating as a competitive business . . . [including] Goodman's wages[,] . . . Goodman's share of rental income received from leasing commercial property to inTEAM[,] . . . and the tax benefits enjoyed by Goodman from running inTEAM as a tax shelter" for Goodman's breach of the non-compete provision contained in the Asset Purchase Agreement. Def.'s Opening Br. 14-15. Heartland also seeks an additional $400,000 for Goodman's breach of the non-compete provision contained in the Consulting Agreement. *Id.* at 13-14.

14. The Asset Purchase Agreement provides that in the event of a breach by a "Seller or Seller Shareholder[]," the "Seller or Seller Shareholder[] . . . [must] account for and pay over to the Non-Breaching Party all payments, profits, monies, accruals, increments, or other benefits derived or received by Seller or any Seller Shareholder[] . . . as a result of any transaction constituting a breach of any of the restrictive covenants." JX 25, § 5(q)(ii). Even if the Court were to conclude that Goodman qualifies as a "Seller Shareholder" for the purpose of the Asset Purchase Agreement, Heartland has not established what damages it is owed as a result of Goodman's breach of the Asset Purchase Agreement's non-compete provisions. Heartland readily admits that "it's not possible to apportion damages on a transaction-by-transaction basis." Oral Arg. Tr. 16. Instead, Heartland argues that "Goodman's pervasive involvement in the business" means that Goodman should

pay back "all benefits that . . . Goodman enjoyed, including the wages he was paid by inTEAM, the rental income he received from leasing commercial property to inTEAM, and the tax benefits that he received as a result of inTEAM's operating losses." *Id.* at 16-17. But the Asset Purchase Agreement explicitly requires damages to be limited to those that "result [from] any transaction constituting a breach of any of the restrictive covenants." JX 25, § 5(q)(ii). Heartland fails to make any attempt to identify which of these alleged damages, if any, flow from Goodman's breach of the Asset Purchase Agreement; thus, Heartland has not established that it is contractually entitled to damages under the Asset Purchase Agreement.

15. Regarding money damages under the Consulting Agreement, "in the event of breach [of the Consulting Agreement], Heartland has 'no obligation to pay [Goodman] any compensation.'" *inTEAM*, 2016 WL 5660282, at *28 n.322 (quoting JX 22 ¶ 3). On this basis, the Court of Chancery held, and the Supreme Court affirmed, that Goodman must return consulting fees earned from his initial breach of the Consulting Agreement through the end of the Consulting Agreement. *Heartland,* 171 A.3d at 571-72. In computing damages, the Court of Chancery used July 2014 as the initial date of breach, when Goodman began violating his non-solicitation obligations, and September 2014 as the final date, when the Consulting Agreement ended. *Id.* at 571. But the Supreme Court determined that Goodman began breaching his non-compete obligations under the Consulting Agreement in

11

2012. *Id.* at 572. Heartland offers July 2012 as the start date of that breach. Oral Arg. Tr. 54-55. The Consulting Agreement specified that Goodman was to be paid $16,666.67 per month. JX 22 ¶ 3. Thus, unless an affirmative defense applies, Goodman will owe Heartland for twenty-seven months—July 2012 through September 2014—of consulting fees, equal to $450,000.09. Because I already have ordered Goodman to pay $50,003.01, this would result in an additional award of $399,997.08 in money damages from Goodman to Heartland.

16. The Supreme Court instructed the Court of Chancery to consider Goodman's affirmative defenses to his breach of his non-compete obligations. *Heartland,* 171 A.3d at 572. Goodman asserts the affirmative defenses of unclean hands, laches, waiver, acquiescence, and equitable estoppel. Pl. & Countercl. Def.'s Answering Br. 11-26.[3] Money damages are legal in nature, and "the 'unclean hands' doctrine bars equitable, but not legal, relief." *Lehman Bros. Hldgs. v. Spanish Broad. Sys., Inc.*, 2014 WL 718430, at *7 n.47 (Del. Ch. Feb. 25, 2014), *aff'd*, 105 A.3d 989 (Del. 2014); *see also In re Estate of Tinley,* 2007 WL 2304831, at *1 (Del. Ch. July 19, 2007) (explaining that "a litigant seeking equitable relief who appears

---

[3] At trial, Goodman and inTEAM also argued that Heartland failed to mitigate damages. *inTEAM*, 2016 WL 5660282, at *13. But Goodman and inTEAM did not raise this defense in the Answering Brief on remand. Pl. & Countercl. Def.'s Answering Br. 11-26. "Issues not briefed are deemed waived." *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) (citing *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 140 n.3 (Del. 1997); *Murphy v. State*, 632 A.2d 1150, 1152 (Del. 1993)).

with unclean hands will find that relief barred to her," but that the doctrine will not bar legal relief.)  I decline to apply the equitable defense of unclean hands to bar the legal remedy of money damages expressly mandated by the contractual terms of the Consulting Agreement.

17.     In order for the affirmative defenses of laches, waiver, acquiescence, or equitable estoppel to bar Heartland's claims, Goodman must show that Heartland had knowledge of the underlying breach.  *See Reid v. Spazio*, 970 A.2d 176, 182-83 (Del. 2009) (quoting *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 210 (Del. 2005)) ("[L]aches generally requires the establishment of three things: first, knowledge by the claimant; second, unreasonable delay in bringing the claim, and third, resulting prejudice to the defendant."); *Roam-Tel P'rs v. AT&T Mobility Wireless Operations Hldgs. Inc.*, 2010 WL 5276991, at *9 (Del. Ch. Dec. 17, 2010) (quoting *Realty Growth Inv'rs v. Council of Unit Owners*, 453 A.2d 450, 456 (Del. 1982); ("Waiver is the voluntary and intentional relinquishment of a known right."); *Dirienzo v. Steel P'rs Hldgs. L.P.*, 2009 WL 4652944, at *7 (Del. Ch. Dec. 8, 2009) (quoting *Cantor Fitzgerald, L.P. v. Cantor*, 2000 WL 307370, at *24 (Del. Ch. Mar. 13, 2000). (Acquiescence requires that a "complainant has full knowledge of his rights and the material facts."); *Cornerstone Brands, Inc. v. O'Steen*, 2006 WL 2788414, at *3, n.14 (Del. Ch. Sept. 20, 2006) (citing *Scott-Douglas Corp. v. Greyhound Corp.*, 304 A.2d 309, 318 (Del. Super. 1973)) ("In order to prevail on an equitable estoppel

13

theory . . . [the party to be estopped must have] knowledge, actual or constructive, of the real facts."). In the post-trial memorandum opinion, this Court determined that Goodman did not breach his non-compete obligations and that Heartland was aware of Goodman and inTEAM's development of its software. *inTEAM*, 2016 WL 5660282, at \*23. The Supreme Court, however, concluded that Goodman's behavior constituted breach of his non-compete obligations and that Goodman and inTEAM took evasive steps to conceal their behavior from Heartland. *See Heartland*, 171 A.3d at 544, 555, 568 n.90. I read the Supreme Court's opinion as a reversal of both the conclusion that Goodman did not breach the non-compete *and* the finding that Heartland had knowledge of Goodman's and inTEAM's actions.[4] Thus, Goodman's

---

[4]    Heartland points to several documents to support its argument that Goodman and inTEAM concealed their competitive actions from Heartland. Oral Arg. Tr. 19-33; Def.'s Opening Br. 4-6. In its brief, Heartland specifically identifies the email from inTEAM's Vice President of Operations, Erik Ramp, to Heartland's Terry Roberts dated June 8, 2012, as evidence that Goodman attempted to assure Roberts that inTEAM was not trying to develop competitive software. Def.'s Opening Br. 4. In the post-trial memorandum opinion, I found that this email, sent eleven days after the federal guidelines became effective, demonstrated Heartland's knowledge of Goodman and inTEAM's actions. *inTEAM*, 2016 WL 5660282, at \*23. Although the Supreme Court does not explicitly overrule this point, the only logical conclusion is that it agreed with Heartland that Ramp's email, along with other evidence presented by Heartland, reflect concealment rather than disclosure. Otherwise, waiver would have been the necessary outcome in the Supreme Court's opinion. Further, the same logic that led to the Supreme Court's finding that Heartland would not enter into a $17 million contract only to immediately allow inTEAM to breach, *Heartland*, 171 A.3d at 564, dictates a finding that Heartland would not allow for an immediate waiver of that breach.

14

affirmative defenses of laches, waiver, acquiescence, and equitable estoppel fail because Heartland lacked knowledge of Goodman's breaching behavior.

18. For the reasons stated above, I vacate the existing injunction against Heartland, decline to issue new injunctions against Heartland, inTEAM, or Goodman, and order Goodman to pay $399,997.08 in money damages for violating his non-compete obligations.

*/s/ Tamika Montgomery-Reeves*
Vice Chancellor
Dated: March 29, 2018