# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THOMAS McKENNA and GARRETT McKENNA, both individually and derivatively on behalf of ROBISON ENERGY FUND MANAGEMENT, LLC and GREEN ENERGY COMPANIES, LLC, | ) ) ) ) ) ) ) | |
| Plaintiffs/Counterclaim Defendants, | ) ) | |
| v. | ) ) | C.A. No. 11371-VCMR |
| DAVID SINGER, DANIEL SINGER, and SINGER ENERGY GROUP, LLC, | ) ) ) ) | |
| Defendants/Counterclaim Plaintiffs, | ) ) | |
| v. | ) ) | |
| WESTPORT CAPITAL PARTNERS, LLC and GEC ENERGY HOLDINGS LLC, | ) ) ) ) | |
| Defendants, | ) ) | |
| ROBISON ENERGY FUND, LLC and GREEN ENERGY COMPANIES, LLC, | ) ) ) ) | |
| Nominal Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 14, 2017
Date Decided: July 31, 2017

James S. Green, Kevin A. Guerke, and Jared T. Green, SEITZ, VAN OGTROP & GREEN, P.A., Wilmington, Delaware; *Attorneys for Plaintiffs/Counterclaim Defendants.*

Todd C. Schiltz and Lindsay B. Orr, DRINKER BIDDLE & REATH LLP, Wilmington, Delaware; Betty M. Shumener, SHUMENER, ODSON & OH LLP, Los Angeles, California; Fred D. Weinstein, KURZMAN EISENBERG CORBIN & LEVER LLP, White Plains, New York; *Attorneys for Defendants/Counterclaim Plaintiffs.*

**MONTGOMERY-REEVES, Vice Chancellor.**

This case arises from a dispute between two families who were once in negotiations to build a business together. The Singer family has owned and operated an energy distribution business in New York for over ninety years. Thomas McKenna was a practicing lawyer, and his son Garrett McKenna worked in the financial services sector. The McKennas believed that through partnering with the Singer brothers, they could capitalize on an opportunity to finance the work and equipment required to convert the energy source for buildings in the Northeastern United States from heating oil to natural gas. The Singer family business, which had substantial debts coming due, would perform the conversion work. The McKennas would raise capital from investors, which would be used to purchase the Singers' family business and refinance that business's debt. The McKennas purported to have a lending plan that the new venture could use to make the oil-to-gas conversion loans. The clients' savings from the difference in price between oil and gas at the time would allow the clients to service the loans.

The Singers and the McKennas formed two Delaware limited liability companies and attempted to raise capital. No one was willing to invest on their proposed terms. But Westport Capital Partners proposed alternative terms for an investment in the business idea. Under the Westport terms, the Singers would contribute their business to a new entity, and Westport would contribute cash. The McKennas would run the financing portion of the business, under Westport's

1

direction, as employees. After extended negotiations, the Singers and Westport entered a deal primarily on Westport's proposed terms. But they could not come to an agreement with the McKennas.

The McKennas now sue for breach of fiduciary duty on the theory that the Singers misappropriated an opportunity that belonged to the limited liability companies of which the Singers and the McKennas were members. The McKennas also assert that the Singers and Westport secretly negotiated to the exclusion of the McKennas in breach of the duty of loyalty. The Singers allege in a counterclaim that the McKennas made material misrepresentations about their qualifications and about the extent of the underwriting they had performed on a potential client that the Singers and the McKennas hoped would be a successful test case for oil-to-gas conversion loans.

In this post-trial opinion, I hold that the McKennas came to this Court with unclean hands in light of misrepresentations they made regarding their experience. Even without unclean hands, however, the McKennas have not proven that the Singers breached their fiduciary duties because the evidence shows that the Westport opportunity never belonged to the limited liability companies, as the McKennas claim. The core terms of the Westport opportunity did not change and never included an equity capital account for the McKennas. Instead, Westport wanted to invest in the Singers' family business in which the McKennas had no interest, and

the Singers were free to pursue that opportunity without the McKennas. Further, the McKennas were aware of the terms of the Westport opportunity throughout the negotiations. I also hold that the Singers failed to prove their counterclaim because the monetary damages they seek did not flow from reliance on any misrepresentations that the McKennas made.

## I. BACKGROUND

The facts in this opinion are my findings based on the parties' stipulations, documentary evidence, depositions, and the testimony of eight witnesses presented at a four-day trial before this Court beginning on November 14, 2016. I grant the evidence the weight and credibility that I find it deserves.[1]

### A. Parties and Relevant Non-Parties

David Singer and Daniel Singer are brothers and owners of Singer Energy Group, LLC ("SEG") along with other members of the Singer family. David and Daniel are co-presidents of SEG.

---

[1] Citations to testimony presented at trial are in the form "Tr. # (X)" with "X" representing the name of the speaker. After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Dr." This opinion refers to the Singers and McKennas by first name for clarity. No disrespect is intended. Exhibits are cited as "JX #." Unless otherwise indicated, citations to the parties' briefs are to post-trial briefs, and citations to the oral argument transcript refer to the post-trial oral argument.

SEG has been in the business of selling and distributing natural gas, heating oil, and electricity to buildings in the New York metropolitan area for over ninety years.[2]

Robison Energy, LLC d/b/a Original Energy ("Robison Energy") is a subsidiary of SEG in the business of converting oil heating systems to natural gas. By 2011, Robison Energy had contracted to convert 204 apartment buildings from oil to natural gas.[3]

Thomas McKenna is a lawyer and entrepreneur. Before the negotiations in question in this case, Thomas served as president of a start-up company called Barnhardt Energy Partners ("Barnhardt").[4] Thomas's son Garrett McKenna has experience as an intern and analyst at Merrill Lynch and J.P. Morgan.[5]

Westport Capital Partners, LLC ("Westport") is an investment firm that manages several funds. Jordan Socaransky and Peter Aronson are principals of

---

[2]  Tr. 709 (Daniel).

[3]  JX 338, at 16.

[4]  JX 162.

[5]  Tr. 448-50 (Garrett).

4

Westport.[6]  And Dean Smith is an outside consultant to Westport who advises on various investments.[7]

Robison Energy Fund, LLC ("REF") and Green Energy Companies, LLC ("Green Energy Companies") are Delaware limited liability companies that the Singers and the McKennas formed to attempt to build a business together.

Mount Hope Housing Company, Inc. ("Mount Hope") is a nonprofit management company for certain low-income housing properties in New York City.[8]  During the events at issue in this case, Mount Hope managed thirty-three multifamily buildings with approximately 1700 units.[9]  Fritz Jean was the chairman of Mount Hope.[10]

## B. Facts

### 1. The McKennas meet the Singers and form REF

In the fall of 2012, Thomas McKenna met with David Singer at the Singers' office in Elmsford, New York to discuss possible synergies between Barnhardt and

---

[6]     JX 138, at 9.

[7]     Tr. 934 (Smith).

[8]     *Id.* at 17 (Thomas).

[9]     *Id.*

[10]    *Id.* at 54.

5

SEG.[11]  At the time, Thomas was the president of Barnhardt, a start-up company focused primarily on geothermal hot water heating for large residential buildings.[12] According to Thomas, he "presented our business sales model, built out in conjunction with Garrett, which enabled our company to finance the costly installation of geothermal energy systems."[13]  Thomas told David that his clients' savings over the first five years of using geothermal power were used to pay the principal and interest on the conversion loans.[14]  In reality, Barnhardt never financed a geothermal energy system installation, but the Singers did not know that at the time.[15]

Because SEG sells carbon-based fuel commodities and Barnhardt had the goal of reducing the carbon footprint, discussions of synergies between those two companies were not successful.[16]  But after David and Thomas's meeting, David expressed an interest in further exploring a model for extending financing to fund

---

[11]   JX 339, at 27.

[12]   JX 162.

[13]   *Id.*

[14]   *Id.*

[15]   Tr. 104 (Thomas) ("Q. You never financed the costly installation of any geothermal energy systems, did you?  A. No, we didn't."); *id.* at 1021 (David).

[16]   JX 162.

Robison Energy's oil-to-gas conversions.[17] Thomas then introduced David to his son Garrett on October 19, 2012 at a lunch meeting at Thomas's country club.[18]

Thomas represented to David that he and Garrett had extensive finance experience,[19] which was important to the Singers because they were not familiar with finance or underwriting loans.[20] The evidence, however, shows that Thomas is a litigator who has worked both in the Westchester County District Attorney's office and in private practice.[21] In private practice, Thomas primarily focused on personal injury litigation,[22] but occasionally drafted a will or advised on a real estate closing.[23] Thomas has never securitized loans[24] and has limited experience with lending work. He represented only two banks as a lawyer, Associate National Mortgage Corporation and Bank of Ireland.[25] He never prepared any loan documents for Associate National Mortgage Corporation, and he testified that he may have

---

[17] JX 339, at 28.

[18] JX 30; Tr. 1018 (David).

[19] Tr. 1021 (David).

[20] *Id.* at 1022-23.

[21] *Id.* at 9 (Thomas).

[22] JX 339, at 5.

[23] Tr. 9 (Thomas).

[24] JX 339, at 47-48.

[25] Tr. 9-10 (Thomas).

prepared some loan documents for Bank of Ireland in the 1980s, but he did not remember.[26] Thomas's only substantial business experience was serving as an interim manager of a beverage distributor in Ossining, New York for approximately eighteen months. He was appointed along with the company's accountants and financial advisors to run the company following the sudden death of the CEO in a car accident.[27]

The evidence also suggests that Garrett's credentials were not accurately represented. Garrett worked at Merrill Lynch and J.P. Morgan as an intern and entry-level employee for three and a half years, and he never underwrote loans in those positions.[28] Garrett subsequently worked with Merriman Capital, a broker/dealer,[29] and as a managing director at Witter Partners, a financial firm in the business of raising capital for mutual funds.[30] But while Garrett was employed with Witter Partners, Merriman Capital terminated its relationship with Garrett.[31] At Witter Partners, Garrett brought in Greenshift Corporation as a client. Garrett instructed

---

26      *Id.* at 96.

27      *Id.* at 10-11.

28      *Id.* at 236, 450 (Garrett).

29      *Id.* at 465.

30      *Id.* at 311; JX 23.

31      Tr. 465 (Garrett).

Greenshift Corporation to pay $20,000 to the Kentros Group, a firm that Garrett and Thomas controlled, rather than to Witter Partners.[32]  On July 31, 2012, Greenshift Corporation fired Witter Partners and cited Garrett's incompetence as the reason.[33] Witter Partners's successor entity, Wealth Partners Capital LLC, fired Garrett on August 5, 2012.[34]  The Singers were not aware of these facts.

After discussions, Daniel, David, Thomas, and Garrett formed REF and signed the REF operating agreement on February 26, 2013.[35]  Daniel, David, Thomas, and Garrett each contributed $1 to REF and were each entitled to a 25% interest in the company.[36]

Daniel met Garrett the day the Singers and the McKennas signed the REF operating agreement, and at that meeting, Garrett told Daniel that he had underwritten hundreds of millions of dollars of loans while at J.P. Morgan, a fact

---

[32]     JX 29; Tr. 120 (Thomas).  Plaintiffs objected to evidence of Garrett's employment history with Witter Partners at trial as improper extrinsic character evidence under Delaware Rules of Evidence 404 and 608.  Tr. 108.  I do not consider the evidence of Garrett's prior employee performance to show that Garrett acted in conformity with the prior conduct here (D.R.E. 404(a)) or as evidence of Garrett's character for truthfulness (D.R.E. 608(b)).  I consider it only for the fact that it was not disclosed when the McKennas touted Garrett's experience and potential investor contacts to the Singers.

[33]     JX 23.

[34]     Tr. 465 (Garrett).

[35]     JX 37.

[36]     *Id.*

9

that was untrue.[37]  Further, despite having been fired by Witter Partners, Garrett mentioned that Witter Partners may be a potential investor in REF in discussions with the Singers for the purpose of inducing the Singers to enter a business relationship.[38]  Neither Garrett nor Thomas ever disclosed to the Singers that Garrett had instructed Greenshift Corporation to pay the Kentros Group rather than Witter Partners or that Garrett had been fired from Wealth Partners Capital, facts that made Witter Partners far less likely to invest in a business Garrett managed.[39]

In March 2013, REF presented a loan term sheet to Mount Hope, a nonprofit low-income housing management company in New York City.[40]  Under the loan term sheet, REF would finance heating system conversions from oil to gas for a Mount Hope property, and Robison Energy would perform the work to convert the Mount Hope energy systems from oil to gas.  The term sheet calls for a "[f]irst lien UCC 1 Financing Statement on all equipment provided by [Robison Energy] to [Mount Hope] for conversion."[41]  And it is explicitly contingent upon underwriting

---

[37]     Tr. 774-75 (Daniel).

[38]     *Id.* at 776.

[39]     *Id.*; *id.* at 1022 (David).

[40]     JX 37A.

[41]     *Id.*

10

and approval by REF and Robison Energy.[42]  Mount Hope signed the term sheet and fourteen others on similar terms for fourteen other properties.[43]  Mount Hope paid a $29,250 application fee to REF upon signing the term sheets.[44]

### 2. Robison Energy engages an investment bank

In September 2013, SEG had liquidity problems and would soon need to refinance debt that it owed to creditors Angus Fund LLC and Rosenthal & Rosenthal, Inc.[45]  On September 11, 2013, Robison Energy engaged the investment bank Brean Capital to raise capital to pursue a financing business for Robison Energy's oil-to-gas conversions.[46]  Mark Hall was Robison Energy's primary contact at Brean Capital.  At the time, the Singers and SEG were in search of solutions to improve SEG's balance sheet, including a potential sale of Robison Energy for cash to a new

---

[42]     *Id.*

[43]     *Id.*

[44]     *Id.*; Tr. 18 (Thomas).

[45]     Tr. 781-82 (Daniel).

[46]     JX 63.  The McKennas assert that REF, not Robison Energy, engaged Brean Capital. The engagement letter was sent to c/o Thomas McKenna and references the "Fund Conversion business associated with multifamily housing in New York City."  *Id.* But the engagement letter is addressed to Robison Energy and states that "Robison Energy, LLC, its subsidiaries and affiliates (collectively, the "Company") has engaged Brean Capital . . . ."  *Id.*  The signature block of the engagement letter also states "Robison Energy, LLC," and Daniel signed it as president and CEO of Robison Energy.  Thus, I find that Robison Energy engaged Brean Capital.

11

venture in which the Singers would remain involved or a refinancing of SEG's debt.[47]

### 3. The parties replace REF with Green Energy Companies

In September 2013, the Singers and the McKennas hoped that the Mount Hope project and REF would be successful, and REF retained attorney Steve Weiss for transactional advice. REF sought funds from friends and family[48] but failed to raise any money and did not actually make any loans to Mount Hope.[49] Beginning in October 2013, the Singers and the McKennas sought to pitch a different corporate structure to the market. Thomas formed Green Energy Companies, which the Singers and the McKennas believed was a better name for marketing purposes.[50]

Daniel, David, Thomas, and Garrett did not execute a limited liability company ("LLC") agreement for Green Energy Companies.[51] But, Weiss drafted a Private Placement Memorandum ("PPM") for Robison Energy Fund I, L.P., a Delaware limited partnership, ("Fund I"), which outlined the proposed ownership

---

[47]     Tr. 263 (Garrett).

[48]     *Id.* at 16 (Thomas); JX 34.

[49]     Tr. 16 (Thomas).

[50]     JX 172; JX 60.

[51]     Tr. 719 (Daniel).

12

structure for Green Energy Companies.[52]  An unexecuted draft Green Energy

Companies operating agreement was an attachment to the PPM.[53]  Under the PPM,

investors would buy limited partnership interests in Fund I, and Thomas and Garrett

would control the general partner of Fund I.  The general partner was entitled to only

1% of Fund I's capital and profits, and the limited partners were entitled to 99%.[54]

Fund I would own 80% of Green Energy Companies, and the Singers and the

McKennas would each own 5% of Green Energy Companies.[55]  They hoped that

Fund I could raise between $8 million and $25 million, which would be invested

into Green Energy Companies and which Green Energy Companies would use to

purchase Robison Energy from the Singers.[56]  In reality, no one was willing to invest

on the terms proposed in the PPM.

        **4.**       **Westport presents investment terms showing interest in Robison Energy**

In January 2014, Mark Hall at Brean Capital introduced the McKennas and

the Singers to Westport's principal Peter Aronson.[57]  Hall sent Aronson the PPM

---

[52]      JX 88, at 2.

[53]      *Id.* Ex. 2.

[54]      *Id.* at 20.

[55]      *Id.*

[56]      *Id.* at 9.

[57]      JX 98.

13

and exhibits, including the draft Green Energy Companies limited liability company agreement and wrote, "[i]t will be modified to fit whatever we do with you if you choose to move forward."[58] Hall also sent historic financials for Robison Energy[59] but no financial data for REF or Green Energy Companies, as those companies had no operations and no assets other than a small amount of cash. On January 23, 2014, David and Hall met Aronson and Jordan Socaransky at Westport's offices in Connecticut,[60] and on January 24, 2014, Socaransky wrote to Hall in an email, "[i]t's a very interesting opportunity and we will get a term sheet together in short order."[61]

Westport expressed no interest in having additional retail investors participate as the PPM suggested.[62] Westport also was not interested in a deal that involved purchasing Robison Energy from the Singers for cash like the PPM proposed.[63] On January 30, 2014, Socaransky sent Hall a draft term sheet for a Westport loan to Robison Energy and a Westport equity investment in Green Energy Companies.[64]

---

[58]    JX 99.

[59]    JX 100.

[60]    JX 106.

[61]    *Id.*

[62]    JX 105.

[63]    Tr. 1031 (David).

[64]    JX 110.

14

Under the term sheet, the Singers would contribute the Robison Energy commercial business to Green Energy Companies, and the Robison Energy valuation would determine the value of their capital account.[65] The term sheet included a capital account for the owners of Robison Energy. And it provided an eight-tier profit distribution waterfall under which Westport received a priority return of its capital plus a 12% profit; "Management"[66] with a capital account would receive a return of capital plus 12% in the fourth and fifth tiers; and Management without a capital account would share as a carried interest in the seventh and eighth tiers.[67] Garrett vehemently opposed the draft term sheet, calling it an "insult"[68] and "completely without understanding of the deal" in the PPM.[69] Daniel also opposed the first term sheet.[70]

---

[65]    *Id.*

[66]    *Id.* Plaintiffs argue and Thomas testified that the McKennas were included in the definition of the term "Management" in the term sheet. Pls.' Answering Br. 3; Tr. 174 (Thomas). I agree, but the waterfall distinguishes between Management with capital accounts and Management without capital accounts. And the term sheet does not provide for a capital account for the McKennas because the McKennas had no interest in Robison Energy.

[67]    JX 110.

[68]    JX 111.

[69]    JX 112.

[70]    JX 115.

Hall continued to negotiate with Westport,[71] and on February 13, 2014, Westport proposed a similar term sheet under which Westport's investment in Robison Energy would be preferred equity rather than debt.[72] Under the second term sheet, Westport indicated that it was open to considering a higher valuation for Robison Energy as well.[73] But the basic structure was unchanged from the first term sheet. Under the second term sheet, the Singers would contribute Robison Energy in exchange for a capital account, and Westport would contribute cash and receive a priority return. Management without a capital account would share in the seventh and eighth tiers of a profit distribution waterfall.[74]

On February 26, 2014, Westport sent a final term sheet on substantially the same terms as the February 13, 2014 draft.[75] Daniel signed on behalf of Green Energy Companies and Robison Energy on February 28, 2014,[76] and Socaranky and Aronson signed on behalf of Westport on March 3, 2014.[77] The term sheet outlined

---

[71]     JX 113.

[72]     JX 120.

[73]     *Id.*

[74]     *Id.*

[75]     JX 133.

[76]     JX 137.

[77]     JX 139.

Westport's intent to "(i) make a preferred equity investment in Robison Energy LLC ('Robison') to facilitate refinancing of Robison's existing indebtedness, and (ii) to make an investment in a newly formed company called Green Energy Companies, LLC ('GEC' or 'Newco') which has been formed by a group led by David Singer and other key executives of Robison (hereinafter referred to as 'Management'), to acquire Robison's commercial energy business . . . ."[78] The final term sheet included the same core terms as the first term sheet. After debt service, Westport was entitled to a 12% return and the return of its invested capital. After that, Management with a capital account was entitled to a 12% return and the return of its invested capital.[79] Management without a capital account would share only in the seventh and eighth tiers as a carried interest.[80]

The McKennas and the Singers decided together to sign the term sheet.[81] Nothing in the term sheet indicates that the McKennas planned to contribute any assets. Thus, they would not have capital accounts and would share in profits in the seventh and eighth tiers through a carried interest.[82] Thomas and Garrett understood

---

[78]    *Id.*

[79]    JX 138, at 6-7.

[80]    *Id.* at 7.

[81]    JX 139 (email with signed term sheet addressed to Thomas, Garrett, Daniel, and David); Tr. 45 (Thomas); *id.* at 282 (Garrett); Pls.' Opening Br. 15.

[82]    Tr. 601-02 (Socaransky).

that to the extent they would have capital accounts, they were still to be negotiated.[83]

But Westport and the Singers never had any intention of giving away some of their assets to the McKennas.[84]  And the McKennas never made an offer to contribute assets in exchange for a capital account.[85]

On March 18, 2014, Westport's in-house counsel Marian V. Presti sent a disclosure form to Thomas, Garrett, Daniel, and David and requested that they each complete it.[86]  The form stated that

> [a] separate copy of this Disclosure Statement should be completed by Robison Energy, LLC ("Robison"), all general partners or managing members of Robison, and all "Key Principals" (meaning David Singer, Daniel Singer, Thomas McKenna, Garrett McKenna and any individuals/entities owning a 20% or greater interest, directly or indirectly, in Robison or its general partners or managing members).[87]

The form requested respondents' ownership interest and percentage in Robison Energy, but it did not request any information about other asset holdings.[88]  Daniel, David, Thomas, and Garrett completed the disclosure forms.  Thomas indicated that

---

[83]     *Id.* at 50 (Thomas); *id.* at 490 (Garrett).

[84]     Tr. 601-02 (Socaransky).

[85]     *Id.* at 166 (Thomas).

[86]     JX 142.

[87]     *Id.*

[88]     *Id.*

18

he held 0% of Robison Energy,[89] and Garrett left that question blank.[90] Both Thomas and Garrett also wrote on their disclosure forms that they owned 25% of Green Energy Companies and 25% of REF even though no ownership information was requested regarding those entities.[91]

### 5. The Singers and Westport become concerned about Garrett's performance

In April 2014, the parties began seeking a senior term loan and a revolving credit line for the Green Energy Companies project. On April 11, 2014, Hall submitted a request for proposal to NY Green Bank to obtain a $75 million line of credit for Green Energy Companies.[92] The request was in the form of a PowerPoint presentation that showed Thomas on the board of Green Energy Companies.[93] Socaransky and Smith edited the presentation but did not remove Thomas from the board.[94] Thomas and Garrett argue that at that time, the parties understood that Thomas was a managing member of Green Energy Companies.[95]

---

[89]    JX 144.

[90]    JX 145.

[91]    JX 144; JX 145.

[92]    JX 157; JX 154.

[93]    JX 155, at 35.

[94]    *Id.*; JX 156, at 35.

[95]    Pls.' Opening Br. 19.

While attempting to obtain a loan commitment for a Green Energy Companies working capital loan, the Singers became concerned about Garrett's performance. In the spring of 2014, Garrett was coordinating a request for a line of credit and senior term loan from Santander Bank. On April 2, 2014, Mark Becue at Santander Bank sent Daniel an email indicating that he had requested additional information from Garrett a week before and Garrett had not responded to his follow-up calls and emails.[96] Daniel forwarded the email to David who sent Thomas the following email:

> [W]e are coming down the home stretch and I need to know what's going on with Garrett. I have to be perfectly honest with you that the partners are very concerned about your participation going forward. Garrett will definitely be compensated for the work and effort he has put in but I am very concerned about building a business together.[97]

After this email, Garrett sent Robison Energy an invoice for $20,000 in "investment banking consulting" from the Kentros Group.[98] Robison Energy paid the Kentros Group that amount on April 28, 2014.[99]

---

[96]    JX 151.

[97]    *Id.*

[98]    JX 47.

[99]    *Id.*

By May 2014, Smith became concerned that Garrett and Thomas had not established a detailed business plan for originating and underwriting the loans that the parties planned to make through Green Energy Companies.[100] On May 14, 2014, Smith wrote to Socaransky and the Singers, "I think we need to get realistic about [the McKennas'] role and capacities. We need to talk about bringing in an experienced origination professional who can actually develop and execute an action plan. It is now clear that this is simply beyond Garrett's and Thomas's capabilities."[101] Daniel responded, "I think the McKenna's [sic] have put in the time that has earned them an uncontested first shot. . . . If they can't get us to where we need to be, then we need to look for alternatives."[102]

While Thomas and Garrett had the idea to start a financing business, they did not develop a lending program in which Westport was comfortable investing. Westport never received underwriting guidelines from Garrett,[103] and on May 15, 2014, Smith sent draft underwriting guidelines for the Green Energy Companies business to the McKennas and the Singers for discussion.[104]

---

[100]    JX 168.

[101]    *Id.*

[102]    *Id.*

[103]    Tr. 941 (Smith).

[104]    JX 169.

Later that day, Thomas sent a memorandum to Westport outlining proposed job descriptions for Thomas, Garrett, and certain other positions. Both Thomas's and Garrett's proposed job descriptions anticipated that they would "[r]eport to partners."[105] By this point, the McKennas understood that they would not be partners in Green Energy Companies. The parties nevertheless continued to negotiate.

On June 9, 2014, Thomas asked Socaransky for draft employment agreements for him and Garrett.[106] Socaransky testified that he did not believe at that point that the parties were negotiating with the McKennas for a capital account or equity stake in Green Energy Companies.[107] Rather, he thought that the McKennas would be employees.[108]

### 6. The McKennas fail to reach agreement on an employment relationship with the Singers and Westport

On June 10, 2014, Socaransky completed a draft Investment Memorandum for the Westport Investment Committee describing the Green Energy Companies project as proposed in the February 26, 2014 term sheet in more detail.[109] The Investment Memorandum states that Westport will provide funding to recapitalize

---

[105] JX 170.

[106] JX 174.

[107] Tr. 595 (Socaransky).

[108] *Id.*

[109] JX 176; JX 309.

SEG and that SEG and Westport will sponsor Green Energy Companies.[110] The Investment Memorandum states that the McKennas will run the finance business under the direction of Smith, Westport's consultant.[111] Separately, the Investment Memorandum contemplates hiring a CFO and Credit Risk Manager to supplement the SEG and Green Energy Companies management teams.[112] The memorandum does not suggest that the McKennas were being considered for those roles.

On June 13, 2014, Westport and the Singers sent a modified version of the NY Green Bank presentation to Citibank as they continued to pitch the Green Energy Companies business for a line of credit. In the modified version, Daniel replaced Thomas on the board of directors.[113] But the parties still expected the McKennas to be employees of Green Energy Companies, provided that they could agree on employment terms. Around this time, after a meeting with a potential loan servicing vendor, Smith told the McKennas to negotiate their employment agreements because the deal was going to close.[114]

On June 24, 2014, Thomas emailed Garrett and the Singers as follows:

---

[110]    JX 176, at 2.

[111]    *Id.* at 8.

[112]    *Id.* at 7.

[113]    JX 179.

[114]    Tr. 963-64 (Smith).

23

> Per a discussion G[arrett] and I had with Dean [Smith], we should get together, either Thursday AM or Friday to discuss all our ownership interest in GEC, how it presently (at closing) will be evaluated and how the Remainder interest will be calculated when and if the company is successful.[115]

The McKennas and the Singers met on June 27, 2014.[116] At that meeting, the McKennas focused on the waterfall in the term sheet they had seen in February. The Singers explained that because the McKennas did not have a capital account, they would share in the seventh and eighth tiers of the waterfall through a carried interest.[117]

Thomas sent an email on July 2, 2014 to Socaransky, Smith, and Garrett, with an attached letter stating, "I am opposed to having any part of my equity aligned with the capital contribution based on the value of [Robison Energy]."[118] But the Singers and Westport would not agree to Thomas's proposal. Socaransky testified that Westport was not willing to invest in a company where members who contributed no assets had a capital account.[119] And David testified that the Singers

---

[115]    JX 183.

[116]    Tr. 69 (Thomas) (testifying that the meeting was "somewhere around" June 30, 2014); JX 191 (stating that the meeting was on Friday).

[117]    Tr. 69 (Thomas).

[118]    JX 192.

[119]    Tr. 565, 601-02 (Socaransky).

24

were not willing to give away a portion of the value of Robison Energy to the McKennas.[120]

The McKennas wanted a better deal than the Westport term sheet offered, and they continued to negotiate. On July 7, 2014, Thomas sent the Singers and Garrett a list of issues outstanding.[121] He wrote, in part, as follows:

> 1. Garrett and I should be part of Management and the term should be clearly defined in all documentation;
>
> 2. Garrett and I should have one seat on the Board[;]
>
> 3. The issue of how company percentages must be defined, along with what are the expected [sic] from Westport-how much and what they will invest over what period and will this diminish percentages. Original's contribution could be diminished to virtually 0%.[122]

But Westport was never willing to agree to granting a board seat to members who had not contributed assets.[123] And, to the extent Thomas was requesting a capital account, the Singers were not willing to give part of Robison Energy to the McKennas through Green Energy Companies.[124]

---

[120]    *Id.* at 1111 (David).

[121]    JX 197.

[122]    *Id.*

[123]    Tr. 604 (Socaransky).

[124]    *Id.* at 1030-31 (David).

25

The Singers and the McKennas met on July 8, 2014 and began to negotiate the terms of a proposed release of any interest the McKennas had in Green Energy Companies because Westport and SEG wanted to use the Green Energy Companies name to operate the financing business outlined in the Westport term sheets.[125] The proposed release relinquished the McKennas' interest in Green Energy Companies in exchange for each of Thomas's and Garrett's right to receive "20% of any and all amounts distributed to SEG pursuant to Section ___ of the GEC Amended and Restated Operating Agreement . . . provided that at the time SEG receives such distribution, [Thomas] or Garrett, as applicable, is still employed by GEC or an affiliate of GEC."[126] The blank space in the draft release indicates that the Singers and the McKennas had not yet decided out of which tier of the waterfall the McKennas would share in exchange for the release. Regardless, the Singers and McKennas never agreed to the terms of that draft release.

During the July 8 meeting, Daniel sent an email to Socaransky, Smith, and David, stating that "[w]e are in [a] meeting with Tom and Garrett right now. I think

---

[125]   *Id.* at 1092 ("[W]e were trying to proceed forward under this corporate name that the McKennas still had an interest in . . . .").

[126]   JX 200, ¶ 3. Plaintiffs argued that this draft release refers to the fourth tier of the waterfall (Pls.' Answering Br. 4), but the draft agreement is silent on that point. And the other evidence Plaintiffs cite relates to the negotiation of the terms of Thomas's and Garrett's employment with Green Energy Companies, which is unrelated to this release.

26

we are much closer together then [sic] we had feared this morning."[127] After the meeting, Daniel sent an email to Smith and Socaransky explaining that the McKennas had only one request that required discussion.[128] "Basically it is an option on their part to invest any compensation bonus they would be eligible for into the company for participation in the water fall at some point between the return of our capital +12% and the 92.5/7.5 distribution"—in other words, somewhere between the fifth and seventh tiers.[129] "They are fine with just and [sic] advisory role on the board."[130]

On July 14, 2014, Smith sent a closing checklist to the Singers, Socaransky, and Presti, which included a line item for the McKennas' employment agreements.[131] At this point, the Singers and Westport were willing to employ the McKennas and allow them to share in the Green Energy Companies profits as a carried interest and potentially with a capital account to the extent the McKennas contributed assets.[132] And the McKennas were interested in being Green Energy

---

[127]   JX 195.

[128]   JX 196.

[129]   *Id.*

[130]   *Id.*

[131]   JX 199.

[132]   Tr. 567 (Socaransky).

27

Companies employees. On July 22, 2014, Thomas sent Socaransky an email stating, "I am anxious to discuss employment contracts and the specific role G[arrett] and I have in the corporate structure."[133] But at trial, Thomas testified that the McKennas did not want to be employees even if that was the only way in which Westport and the Singers would invest their assets in the business.[134]

### 7. The Singers and the McKennas' relationship breaks down

By late summer 2014, Westport and the Singers were becoming frustrated with the McKennas' lack of progress on developing a financing program for Green Energy Companies. On August 5, 2014, Smith sent Garrett a list of documents that Westport would need for Mount Hope due diligence.[135] Garrett did not respond to that email. On August 8, 2014, Westport and the Singers learned from Garrett that a full diligence package to obtain a working capital line of credit would not be ready until mid-September, meaning that Robison Energy would have to enter the heating season without a working capital loan from a bank.[136] Daniel and Smith were both

---

[133]     JX 203.

[134]     Tr. 89 (Thomas) ("Garrett and I were never in this to have a job.").

[135]     JX 222.

[136]     JX 227A.

28

disappointed by this development since Garrett had taken the lead on obtaining a working capital loan months before.[137]

On August 16, 2014, Smith emailed a fillable loan application form that he had created for the Green Energy Companies oil-to-gas conversion projects to Socaransky and other Westport employees.[138] In that email, he stated that he was "well along in drafting detailed loans underwriting policies and procedures," and had document checklists for condominium and cooperative buildings.[139] Smith wrote, "Garrett McKenna was supposed to provide me with checklists for other property types, but as is becoming depressingly familiar, he has failed to do so."[140] On August 19, 2014, Smith followed up with Garrett regarding his August 5 request for diligence documents from Mount Hope to conduct the underwriting.[141]

On August 25, 2014, Garrett wrote to Smith, Socaransky, Thomas, David, and Jordan Estevez, a Westport employee, requesting a meeting to discuss the underwriting of the Mount Hope project.[142] Smith responded explaining that

---

[137]    *Id.*

[138]    JX 231.

[139]    *Id.*

[140]    *Id.*

[141]    JX 234.

[142]    JX 237.

Westport was planning on making a bridge loan to Mount Hope apart from the Green Energy Companies "program loans" for which a lending program had yet to be developed. As to the bridge loan, Smith wrote, "Westport is underwriting this deal."[143] Smith directed Garrett to the list of documents that he had requested twenty days earlier for that due diligence.[144] As to establishing an underwriting process for the "program loans" going forward, Smith agreed that they needed to develop a lending platform and asked for feedback on the underwriting guidelines he sent the week before, which Garrett never provided.[145] Garrett responded, "I guess my interest becomes what am I getting paid to originate this deal? Westport and I need a contract."[146]

By this time, the Singers' and Westport's relations with the McKennas, particularly Garrett, had soured.[147] On the evening of August 25, 2014, David emailed Garrett regarding Smith's document request as follows:

> His doc request has been out there for weeks for your review. We had a meeting on mount hope last week and you didn't say a word about the scanning or the docs. Now we are past the 11th hour on mount hope and we are just starting to gather docs that we knew we needed for

---

[143]   *Id.*

[144]   *Id.*; JX 222.

[145]   JX 237; Tr. 1056 (David).

[146]   JX 237.

[147]   JX 236.

30

months. We can't keep pointing fingers at each other, it's time to get things done. Without Westport's bridge the mount hope deal is dead, if we don't get the mount hope deal done we can forget the not for profit sector.[148]

Daniel replied only to David stating, "[t]hese guys have to produce something real. If they don't start showing their worth soon they will be out of a job and out of this deal."[149]

On September 2, 2014, Thomas emailed Daniel and David explaining his and Garrett's frustration "with the process of moving GEC forward."[150] He wrote, "[w]e do not wish to leave anyone in a[n] unacceptable position but in balancing our needs and the companies' needs we need to be adequately compensated to continue working on behalf of GEC even if this is without an employment contract."[151] The same day, Thomas failed to attend a meeting with Smith, Socaransky, and the Singers for which he had previously confirmed he was available.[152]

### 8. The Singers pursue the Westport investment alone

On July 29, 2014, Thomas wrote to the Singers and Smith as follows:

Pertaining to GEC, LLC. This entity started out as Robison Energy Fund, LLC—I put this together, authored

---

[148] *Id.*

[149] *Id.*

[150] JX 248

[151] *Id.*

[152] JX 249.

> the Operating Agreement, obtained the EIN and opened a bank account. . . . Afterward, we wanted to change the name to Green Energy Fund and we hire [sic] Steve Weiss and he formed the entity and the Operating Agreement . . . . However, the Operating Agreement was never fully executed by the members of Robison Energy Fund. I did obtain a EIN number (which you all have) but no bank account was opened for GEC. Essentially GEC is a shell that again you can use and design as you wish.[153]

Smith replied to all, including Thomas, stating, "[a]s I understand it, there actually is no company called 'Green Energy Companies, LLC.' In that case I would recommend just form a new company and be done with it, rather than amending an obsolete operating agreement, getting releases, changing the name with the IRS, etc."[154] In response, Thomas wrote, "[t]he name is already taken & [the EIN] already in place[.] [It's] essentially a shell for you to mold as you please."[155] Thomas, thus, acknowledged that Green Energy Companies' only desirable asset was its name.

In light of the ongoing tensions with the McKennas, the Singers and Westport did not come to agreement with them regarding employment with Green Energy Companies. Westport and the Singers decided that the Green Energy Companies

---

[153] JX 213.

[154] *Id.*

[155] JX 215.

name was not worth the effort of dealing with the McKennas.[156]  On August 26, 2014, Daniel wrote to Aronson, Socaransky, and Smith as follows:

> [T]he actual Green [E]nergy Compan[ies], LLC itself . . . is still owned by the Robison fund which the McKenna's [sic] have a 50% ownership interest in.  The plan was to induce them to sign a release of any claim to GEC but given their behavior this week and the fact that they don't have an employment contract yet (we intended to use David and mine as a model) they may not be inclined to sign off and I don't want to risk that standing in the way of the closing.  I think it would be prudent to form a new Delaware LLC and potentially use the newly created company as our holding company.[157]

The next day, Daniel emailed Smith, Socaransky, David, and Presti, stating "I am about to instruct [the Singers' attorney] Levy to create a new Delaware company named 'GEC Holdings, LLC' to replace 'Green Energy Companies, LLC' in all of our agreements and documents.  Any objections?"[158]  Socaransky responded

---

[156]  Tr. 607 (Socaransky) ("[T]he only thing we liked about the Green Energy Companies was the name.  I mean, it was just an empty shell . . . we could form a new entity very easily, and we were looking for the path of least resistance to not have more brain damage at that point in the process."); *id.* at 701 ("[W]e made the decision that we weren't going to jump through hoops just to save a name of a shell company . . . .").

[157]  JX 241.

[158]  JX 243.

"[o]k,"[159] and Levy created GEC Energy Holdings, LLC, a Delaware limited liability company ("GEC Holdings").[160]

The Singers and Westport proceeded to close the deal outlined in the February 26, 2014 term sheet, but they decided not to employ the McKennas. In resolving final issues to close the deal, Smith wrote to Socaransky on September 8, 2014 as follows:

> I've had no update re McKenna's [sic] since . . . last week.
> . . . [T]hey're not receiving any consideration at closing so asking for a release isn't in order. The entity they were to own 50% of is defunct . . . . So, again, I say proceed to close—realizing there is risk if Tom gets his back up—and deal with them after the fact.[161]

On September 18, 2014, six Westport funds and Singer Commercial Energy, LLC, a new entity formed by the Singers, executed the operating agreement for GEC Holdings on terms similar to those outlined in the Socaransky Investment Memorandum and the February 26, 2014 term sheet.[162]

---

[159] *Id.*

[160] Tr. 760 (Daniel).

[161] JX 252.

[162] Compl. Ex. L; JX 322; Tr. 632 (Socaransky).

## 9. GEC Holdings makes loans to Mount Hope with capital from Westport

A month before the Singers and Westport closed the GEC Holdings deal, the parties began to focus on Mount Hope again as a test case for the lending project. On August 5, 2014, over a year after Mount Hope signed the REF loan term sheets, Thomas wrote an email to Garrett, Smith, and Socaransky, stating that "Fritz [Jean at Mount Hope] just called me again nervous about getting the money and how quickly he needs it to make this heating season. Garrett has underwritten the financials, everything is ready con ed wise and he needs a $500,000 draw down as soon as possible."[163] Smith replied to all and added the Singers to the email, stating that "[w]e haven't done ANY underwriting yet. . . . I can appreciate that the borrower is nervous, but that is not a reason for us to lose our credit discipline."[164] Later the same day, Garrett wrote in an email to Smith, Socaransky, Thomas, and the Singers that "[t]he only review of the [Mount Hope] deal [that] has been done was a savings calculation for last winter."[165]

The evidence at trial showed that Westport, the Singers, and the McKennas all wanted Mount Hope to be successful so they could use it as a test case for future

---

[163] JX 221.

[164] *Id.*

[165] JX 223.

oil-to-gas conversion financing projects. In August 2014, while the Singers were aware that Westport was only beginning diligence on Mount Hope, Robison Energy began spending money on conversion work for Mount Hope.[166] And in November 2014, Robison Energy began actual conversion work on Mount Hope properties, which continued at least through January 2016.[167] Even though the March 2013 Mount Hope loan term sheets were contingent upon underwriting[168] and Mount Hope had been slow to provide the documents needed to complete the underwriting,[169] Robison Energy began the conversion work before financing had been committed[170] and continued "spending hundreds of thousands of dollars for Mount Hope's conversions."[171] Westport considered funding a bridge loan to Mount Hope in order to allow the conversion work to continue.[172] On August 15, 2014,

---

[166]    Oral Arg. Tr. 100; JX 229.

[167]    JX 278 (mechanics liens on Mount Hope buildings showing November 2014 as the earliest "time when the first item of work was performed" and January 2016 as the latest "time when the last item of work was performed").

[168]    JX 39A.

[169]    JX 271.

[170]    Tr. 1057 (David).

[171]    Defs.' Opening Br. 11.

[172]    JX 207; JX 209; JX 237 (Smith wrote on August 25, 2014, "if we are talking about Mt. Hope, remember, even though it's being propped as a GEC Finance deal, this is a one-off bridge loan being funded by Westport. Westport is underwriting this deal . . . . Westport knows how to do this, and it isn't going to fit the model for ordinary course loans.").

Mount Hope and Robison Energy signed a bridge loan term sheet for a $2,500,000 loan, and the capital for the loan would come from a Westport investment in GEC Holdings or Robison Energy.[173]

On September 9, 2014, David emailed Fritz Jean at Mount Hope about outstanding due diligence document requests that the Singers and Westport believed Garrett had made to Mount Hope.[174] Jean was not aware of the request and responded that he would "jump on it" the next morning.[175]

On October 3, 2014, Chris Page, a Robison Energy employee, sent an email to Steven Goldenberg at Mount Hope requesting diligence materials in order to send them to Smith at Westport.[176] Goldenberg responded that the information had already been given to Garrett, and Garrett wrote that he had sent the information to Smith.[177] David testified that a box of Mount Hope files from Garrett, which primarily included rent rolls, was sitting in Robison Energy's office, and David scanned those documents and sent them to Smith with his assistant.[178]

---

[173] JX 229.

[174] JX 253.

[175] *Id.*

[176] JX 256.

[177] *Id.*

[178] Tr. 1062 (David).

After all of the Mount Hope diligence documents that had been received were assembled in Smith's possession, David "took it upon [himself] to go to Mount Hope and get the rest of the documents."[179] By this time, David had known for at least two months that no one had completed underwriting for loans to Mount Hope.[180] When David went to Mount Hope, Fritz Jean explained to him that a loan to Mount Hope could not be secured by mortgages on Mount Hope's properties without the consent of the City of New York.[181] The more Westport learned about Mount Hope, the worse the Mount Hope deal appeared. On January 15, 2015, Smith sent Socaransky an email explaining that the affordable housing regulator had forced Mount Hope to engage a property management company for its building portfolio and was requiring that Mount Hope complete a capital needs assessment.[182] Finally, Smith wrote that the Singers had spent $700,000 in work on Mount Hope buildings and that if they had not done that, Smith would "run away" from this deal.[183] On January 16, 2015, GEC Holdings filed mechanics liens for the work done on the

---

[179]    *Id.*

[180]    *See* JX 221.

[181]    Tr. 1064-65 (David).

[182]    JX 270.

[183]    *Id.*

Mount Hope properties.[184]  As of January 27, 2015, Mount Hope had not produced "basic requested information" to Westport.[185]

By April 9, 2015, Westport learned of the full extent of Mount Hope's lack of available collateral.  Socaransky wrote Smith an email stating that 99% of the appraised value of Mount Hope's assets is subject to a priority debt claim.[186]  On January 21, 2016, GEC Holdings finally entered forbearance and installment payment agreements with Mount Hope.[187]

## C.    Procedural History

Plaintiffs Thomas and Garrett McKenna filed their complaint in this case on August 5, 2015 alleging claims for breach of fiduciary duty, unjust enrichment, aiding and abetting in breach of fiduciary duty, and civil conspiracy with respect to REF in counts I through IV.  The complaint alleges the same claims with respect to Green Energy Companies in counts V through VIII.  The Singers and SEG filed an answer and counterclaim for fraudulent inducement on September 22, 2015.  Westport and GEC Holdings also filed an answer on September 22, 2015.  Plaintiffs filed a reply answering the counterclaim on October 12, 2015.  The Singers and SEG

---

[184]     JX 278.

[185]     JX 271.

[186]     JX 299.

[187]     JX 332; JX 333.

amended their answer on October 12, 2015 and again on October 24, 2015. Westport and GEC Holdings amended their answer on May 6, 2016. The Court held a four-day trial beginning on November 14, 2016 and heard post-trial oral argument on April 7, 2017. The parties filed post-trial submissions on April 10, 2017, April 13, 2017, and April 14, 2017. This post-trial opinion resolves this case.

## II.    ANALYSIS

"Plaintiffs, as well as Counterclaim-Plaintiffs, have the burden of proving each element, including damages, of each of their causes of action against each Defendant or Counterclaim-Defendant, as the case may be, by a preponderance of the evidence."[188]  "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not."[189]  "By implication, the preponderance

---

[188]    *Mrs. Fields Brand, Inc. v. Interbake Foods LLC*, 2017 WL 2729860, at *16 (Del. Ch. June 26, 2017) (quoting *inTEAM Assocs., LLC v. Heartland Payment Sys., Inc.*, 2016 WL 5660282, at *13 (Del. Ch. Sept. 30, 2016)) (internal quotation marks omitted).

[189]    *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (quoting *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002)) (internal quotation marks omitted).

of the evidence standard also means that if the evidence is in equipoise, Plaintiffs lose."[190]

## A. Plaintiffs Seek Equity with Unclean Hands

Defendants assert that the McKennas come to the Court of Chancery with unclean hands. The Court of Chancery is a court of equity. And "[t]he maxim of equity that '[he] who comes into equity must do so with clean hands' . . . is well embedded in American jurisprudence."[191] Plaintiffs are not entitled to equitable relief when their "own acts offend the very sense of equity to which [they] appeal[]."[192] As this Court stated in *Skoglund v. Ormand Industries, Inc.*, "the purpose of the clean hands maxim is to protect the public and the court against misuse by one who, because of his conduct, has forfeited his right to have the court consider his claims, regardless of their merit."[193] The Delaware Supreme Court has stated that "[t]he Court of Chancery has broad discretion in determining whether to

---

[190] *inTEAM Assocs., LLC v. Heartland Payment Sys., Inc.*, 2016 WL 5660282, at \*13 (Del. Ch. Sept. 30, 2016) (quoting *Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at \*9 (Del. Ch. Oct. 30, 2015)) (internal quotation marks omitted).

[191] *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 522 (Del. Ch. 1998) (quoting *Kousi v. Sugahara*, 1991 WL 248408, at \*2 (Del. Ch. Nov. 21, 1991)).

[192] *Nakahara*, 718 A.2d at 522.

[193] *Skoglund v. Ormand Indus., Inc.*, 372 A.2d 204, 213 (Del. Ch. 1976).

41

apply the doctrine of unclean hands."[194]  This Court "[is] not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion."[195]

But the Court's discretion is not completely unlimited.  For the doctrine of unclean hands to apply, the plaintiff's inequitable conduct must be related to the equitable relief the plaintiff seeks.[196]  "The standard, as applied by the Court of Chancery, is that the inequitable conduct must have an 'immediate and necessary' relation to the claims under which relief is sought."[197]  The Court of Chancery has held that fraudulent misrepresentations can constitute inequitable conduct for unclean hands purposes when the misrepresentations have an "immediate and necessary" connection to the claims asserted.[198]

Ultimately, this dispute is about the fiduciary duties that attach when managing members form a Delaware limited liability company together.  The McKennas argue that the Singers breached those duties by misappropriating an

---

[194]  *RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 876 (Del. 2015) (quoting *SmithKline Beecham Pharm. Co. v. Merck & Co.*, 766 A.2d 442, 448 (Del. 2000)) (internal quotation marks omitted).

[195]  *Nakahara*, 718 A.2d at 522-23 (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245-46 (1933)) (internal quotation marks omitted).

[196]  *Nakahara*, 718 A.2d at 523.

[197]  *Id.* (quoting *Kousi v. Sugahara*, 1991 WL 248408, at *2 (Del. Ch. Nov. 21, 1991)).

[198]  *In re Rural/Metro Corp. S'holders Litig.*, 102 A.3d 205, 238-39 (Del. Ch. 2014).

opportunity to receive an investment from Westport that belonged to Green Energy Companies or REF. And they ask this Court to order that the investment from Westport be rescinded, that the Singers pay damages, and that they disgorge any profits. Essentially, the McKennas want a remedy that would allow them to share in the GEC Holdings business.

But the McKennas made a series of misrepresentations to the Singers in their initial discussions to form the very business they now invoke as the basis for their claims.

> In an arm's length negotiation, where no special relationship between the parties exists, "a party has no affirmative duty to speak" and "is under no duty to disclose facts of which he knows the other is ignorant even if he further knows the other, if he knew of them, would regard them as material in determining his course of action in the transaction in question." But, if a party "chooses to speak then it cannot lie," and "once the party speaks, it also cannot do so partially or obliquely such that what the party conveys becomes misleading."[199]

Once Garrett and Thomas chose to make the representation regarding their experience, they could not lie or mislead. But in the fall of 2012, Thomas met David and told him that he was the president of Barnhardt, a geothermal energy company. Thomas represented to David that Barnhardt had financed the installation of costly

---

[199] *Trusa v. Nepo*, 2017 WL 1379594, at \*10 (Del. Ch. Apr. 13, 2017) (quoting *Prairie Capital III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 52 (Del. Ch. 2015)).

43

geothermal energy systems while Thomas was president of the company.[200] Thomas represented that Barnhardt paid the initial capital for oil-to-geothermal conversions, and the energy savings over the first five years were used to repay Barnhardt's principal plus interest.[201] But that was false. Thomas admitted at trial that Barnhardt never financed any geothermal energy system installations.[202] And Barnhardt never paid the initial capital for an oil-to-geothermal conversion.[203] Thomas also has never securitized loans.[204]

Thomas also represented to the Singers that his son Garrett had extensive finance experience,[205] which was important to the Singers because they were not familiar with finance or underwriting loans.[206] The day the Singers and the McKennas signed the REF operating agreement, Garrett told Daniel that he had underwritten hundreds of millions of dollars of loans while at J.P. Morgan.[207] Garrett also mentioned that his former employer, Witter Partners, may be a potential investor

---

[200] Tr. 1020 (David); JX 162.

[201] JX 162.

[202] Tr. 104 (Thomas).

[203] *Id.*

[204] JX 339, at 47-48.

[205] *Id.* at 1021 (David).

[206] *Id.* at 1022-23.

[207] *Id.* at 774-75 (Daniel).

in REF.[208]  In fact, Garrett worked at Merrill Lynch and J.P. Morgan as an entry-level employee for three and a half years, and he never underwrote loans in those positions.[209]  Garrett subsequently worked with Merriman Capital, a broker/dealer,[210] and Witter Partners, a financial firm in the business of raising capital for mutual funds.[211]  But while Garrett was employed with Witter Partners, Merriman Capital terminated its relationship with Garrett.[212]  At Witter Partners, Garrett brought in Greenshift Corporation as a client.  Garrett instructed Greenshift Corporation to pay $20,000 to the Kentros Group, a firm that Garrett and Thomas controlled, rather than to Witter Partners.[213]  On July 31, 2012, Greenshift Corporation fired Witter Partners and cited Garrett's incompetence as the reason.[214] Witter Partners's successor entity, Wealth Partners Capital LLC, fired Garrett on August 5, 2012.[215]

---

[208]  *Id.* at 776.

[209]  *Id.* at 236, 450 (Garrett).

[210]  *Id.* at 465.

[211]  *Id.* at 311.

[212]  *Id.* at 465.

[213]  JX 29; Tr. 120 (Thomas).

[214]  JX 23.

[215]  Tr. 465 (Garrett).

The Singers and the McKennas executed the REF operating agreement and formed Green Energy Companies in part because of the McKennas' misrepresentations. The Singers had no experience in finance and wanted to partner with experts.[216] The McKennas now seek to enforce the equitable fiduciary duties that attached when they formed REF and Green Energy Companies. But the doctrine of unclean hands bars that attempt.[217] The McKennas' misrepresentations have an "immediate and necessary" relationship to the formation of REF and Green Energy Companies, and the McKennas cannot now seek to enforce the fiduciary duties that attached in part because of their misrepresentations.[218]

---

[216]   *Id.* at 1022-23 (David).

[217]   Plaintiffs assert that Westport was also founded based on a breach of fiduciary duty, but that is not the subject of this litigation.

[218]   Defendants argue that only Green Energy Companies has standing to pursue the breach of fiduciary duty claims asserted in this case because neither REF nor the McKennas in their individual capacities owned the opportunity that was allegedly misappropriated. The McKennas can sue derivatively on Green Energy Companies's behalf only if they are members of Green Energy Companies or assignees of Green Energy Companies membership interests. 6 *Del. C.* § 18-1001. Questions exist as to whether the McKennas and the Singers ever became members or managers of Green Energy Companies and whether any Green Energy Companies operating agreement, if it exists, is enforceable in light of the McKennas' misrepresentations. Regardless, I do not address standing because the claims fail on their merits, and a decision on standing would save no resources at this stage.

46

## B. Plaintiffs' Breach of Fiduciary Duty Claims Fail

Even without the doctrine of unclean hands, however, Plaintiffs failed to prove the breach of fiduciary duty claims alleged in counts I and V. "A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty."[219] Managers of Delaware limited liability companies owe the same fiduciary duties as directors of Delaware corporations when the limited liability company agreement does not opt out of fiduciary duties.[220] Directors of Delaware corporations owe two fiduciary duties: the duty of care and the duty of loyalty.[221] No allegations suggest that REF or Green Energy Companies opted out of traditional fiduciary duties in this case. The managers of REF and Green Energy Companies, thus, owe fiduciary duties of care and loyalty. The duty of care requires that directors act on an adequately informed basis with director liability for a duty of care violation "predicated upon concepts of gross negligence."[222] "[T]he duty of loyalty mandates that the best interest of the

---

[219] *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010).

[220] *Auriga Capital Corp. v. Gatz Props.*, 40 A.3d 839, 851 (Del. Ch. 2012); *see* 6 *Del. C.* § 18-1104 ("In any case not provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties and the law merchant, shall govern.").

[221] *See Auriga Capital*, 40 A.3d at 851.

[222] *Smith v. Van Gorkom*, 488 A.2d 858, 873 (Del. 1985) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)) (internal quotation marks omitted), *overruled on other grounds by Gantler v. Stephens*, 965 A.2d 695 (Del. 2009).

47

corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[223]

### 1. Neither REF, Green Energy Companies, nor the McKennas had an interest or expectancy in the Westport investment

The McKennas argue that the Singers misappropriated the opportunity for REF and Green Energy Companies to obtain a Westport investment. The Delaware Supreme Court held in the often-cited *Guth v. Loft, Inc.* case that when a director pursues a corporate opportunity for himself or herself, the director violates the duty of loyalty.[224] The Supreme Court in *Broz v. Cellular Information Systems, Inc.* explained the corporate opportunity doctrine as follows:

> [A] corporate officer or director may not take a business opportunity for his own if: (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation.[225]

---

[223] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

[224] *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939) ("The rule, referred to briefly as the rule of corporate opportunity, is merely one of the manifestations of the general rule that demands of an officer or director the utmost good faith in his relation to the corporation which he represents.").

[225] *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 155 (Del. 1996).

The *Broz* factors generally are applied where a director and a corporation compete in buying an asset.[226] In *Thorpe by Castleman v. CERBCO, Inc.*, the Delaware Supreme Court applied this doctrine in the context of competition between a corporation and its controlling stockholder in selling stock to a potential buyer.[227] In *Thorpe*, the Eriksons were directors, officers, and controlling stockholders of CERBCO Inc. INA expressed interest to the Eriksons in purchasing CERBCO's subsidiary East. In response, the Eriksons made a counterproposal to sell the Eriksons' controlling interest in CERBCO to INA.[228] The Eriksons did not inform CERBCO's outside directors of the offer from INA,[229] and when one outside director asked at a board meeting if INA had expressed interest in purchasing East, the Eriksons said that INA had not.[230] The Supreme Court explained that "[i]n order for the Eriksons and CERBCO to compete against one another, their stock must have been rough substitutes in the eyes of INA. If INA considered none of the CERBCO transactions to be an acceptable substitute to the INA-Erikson transaction, then the

---

[226]     *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 443 (Del. 1996).

[227]     *Id.*

[228]     *Id.* at 438.

[229]     *Id.* at 439.

[230]     *Thorpe v. Cerbco, Inc.*, 1995 WL 478954, at \*5 (Del. Ch. Aug. 9, 1995), *aff'd in part, rev'd in part sub nom. Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436 (Del. 1996).

49

opportunity was never really available to CERBCO."[231] "[T]hose transactions which were not economically rational alternatives need not be considered by a court evaluating a corporate opportunity scenario."[232] The Court of Chancery and the Supreme Court in *Thorpe* held that INA's purchase of East was an economically rational alternative to an INA-Eriksons transaction such that the Eriksons breached the duty of loyalty by taking the INA investment for themselves.[233]

Here, the McKennas assert breach of fiduciary duty claims against the Singers for misappropriation of a corporate opportunity that allegedly belonged to REF and Green Energy Companies. The parties frame the opportunity in question in various ways. But the only opportunity presented in this case was an investment opportunity from Westport. And neither REF nor Green Energy Companies, as those companies were structured prior to Westport's involvement, had any interest or expectancy in that opportunity. Like in *Thorpe*, Robison Energy and Green Energy Companies were competing for Westport's investment of capital. And if an investment in Green Energy Companies was a viable alternative to an investment in Robison Energy for Westport, then these facts would be analogous to *Thorpe*. But, unlike in *Thorpe*,

---

[231] *Thorpe*, 676 A.2d at 443.

[232] *Id.*

[233] *Id.* at 445; *see In re Digex Inc. S'holders Litig.*, 789 A.2d 1176, 1190-91 (Del. Ch. 2000) (framing *Thorpe* as a decision under the "interest or expectancy" prong of the corporate opportunity doctrine test).

Westport made clear from the outset of its involvement that the investment structures the McKennas sought to negotiate were not "economically rational alternatives" for Westport.[234] Instead, Westport presented an opportunity under which it would invest on certain static terms.

REF is an LLC with a small amount of cash and no other assets in which the Singers and the McKennas are each 25% members. The McKennas and the Singers hoped that REF would raise capital to make oil-to-gas conversion loans. Garrett suggested raising capital for REF through issuing preferred equity with a guaranteed return.[235] No investors were willing to invest in that entity as it was structured.[236] The McKennas and the Singers appear to have realized this problem, and they set out to negotiate a corporate structure with potential investors outside REF.[237] REF's business was abandoned.[238] As such, Plaintiffs did not prove at trial that REF had an interest or expectancy in any opportunity.

---

[234]   *See Thorpe*, 676 A.2d at 443 ("If INA considered none of the CERBCO transactions to be an acceptable substitute to the INA-Erikson transaction, then the opportunity was never really available to CERBCO.").

[235]   JX 34.

[236]   Tr. 16 (Thomas) (REF raised no money).

[237]   JX 99 ("It will be modified to fit whatever we do with you if you choose to move forward.").

[238]   Tr. 205 (Thomas).

Green Energy Companies was the vehicle for the McKennas and the Singers' next attempt to raise capital for oil-to-gas conversion loans. Garrett proposed a corporate structure through the PPM under which investors would invest in Fund I and collectively would own 99% of Fund I. The McKennas would own the general partner of Fund I, and that general partner would own 1% of Fund I. Fund I would own 80% of Green Energy Companies, and David, Daniel, Garrett, and Thomas would each own 5% of Green Energy Companies. Under the PPM, Green Energy Companies would use the investors' capital to purchase Robison Energy from the Singers. No investors were willing to invest on the terms in the PPM.[239]

---

[239] Plaintiffs presented evidence suggesting that the McKennas individually had some interest in the opportunity through Green Energy Companies. For example, the McKennas point to the request for proposal sent to NY Green Bank that listed Thomas on the Green Energy Companies board (JX 155, at 35); the fact that the McKennas and the Singers decided together to sign the Westport term sheet (JX 139; Tr. 282 (Garrett)); the McKennas' involvement in drafting the PPM; and the draft release of the McKennas' interest in Green Energy Companies that the McKennas and the Singers had begun to negotiate (JX 200). But none of these facts change this analysis because, apart from the potential opportunity to sell its name, neither the McKennas nor Green Energy Companies had any interest or expectancy in the opportunity Westport presented, which was on completely different terms from the PPM. Only Robison Energy did. And after Westport discovered that the McKennas had no interest in Robison Energy, Thomas was removed from the Green Energy Companies board in the request for proposal presentation (JX 179). The Westport investment memorandum describing the Green Energy Companies deal clearly indicated that the McKennas would be employees, not members (JX 176). And the Singers and Westport later determined that negotiating a release with the McKennas for the Green Energy Companies name was not worth the effort.

On January 30, 2014, in response to Hall's solicitation efforts and after receiving Robison Energy's financial information, Westport provided an initial term sheet for an investment in Green Energy Companies and Robison Energy on a completely different set of terms from the PPM. The new Westport terms constituted an opportunity to use the Green Energy Companies name but none of the corporate structure that the Singers and the McKennas had proposed. Instead, the opportunity Westport provided in response to the solicitation efforts was primarily directed at Robison Energy.

Certain key terms of the Westport opportunity did not change from the January 30, 2014 term sheet through the final terms of Westport's investment in Robison Energy and GEC Holdings. Those key terms form the core of the Westport opportunity. Under those core terms, Westport was entitled to a priority return; members' capital accounts would be based on the value of the assets they contributed; and Management with capital accounts would receive a priority return over Management without capital accounts.[240] The Singers would contribute the Robison Energy business to Green Energy Companies in exchange for a capital account, and Westport would contribute cash.[241] None of the Westport term sheets outlined a capital account for the McKennas. In the January 30, 2014 Westport term

---

[240]    JX 110.

[241]    *Id.*

53

sheet, Management without a capital account shared in the seventh and eighth tiers of the waterfall as a carried interest,[242] and the same was true in the final term sheet.[243] Westport and the Singers never had any intention of giving away some of their assets to the McKennas through a capital account.[244] And the McKennas never made an offer to contribute assets in exchange for a capital account.[245]

No investor presented any financing terms to REF, and no one other than Westport presented an investment opportunity to Green Energy Companies.[246] The Westport opportunity relied primarily on the Singers' contribution of Robison Energy. The only Green Energy Companies asset in which Westport and the Singers were interested was the Green Energy Companies name. In the end, however, they decided to pursue the oil-to-gas conversion finance business with a different name

---

[242]    *Id.*

[243]    JX 133.

[244]    Tr. 601-02 (Socaransky).

[245]    *Id.* at 166 (Thomas). At trial, Garrett also framed the opportunity in question as an opportunity to negotiate with Westport using the term sheet as a starting point. *Id.* at 482-83 (Garrett). But even if the opportunity were merely an opportunity to negotiate, the McKennas never offered to contribute any assets, and Westport had no duty to give away a capital account in exchange for nothing.

[246]    *See Thorpe*, 676 A.2d at 443. The parties also extensively brief whether the McKennas rejected the opportunity for a Westport investment, rendering the Singers free to pursue that investment themselves. *See McGowan v. Ferro*, 859 A.2d 1012, 1039 (Del. Ch. 2004). Because I hold that no opportunity was presented to REF or Green Energy Companies, however, I do not reach the question of whether that opportunity was rejected.

to avoid negotiating with the McKennas. As such, the Singers and Westport did not take any asset or opportunity in which Green Energy Companies or REF had an interest or expectancy, and none of the Defendants had any duty to reject Westport's investment.[247]

### 2. The Singers' communications with Westport did not constitute a breach of fiduciary duty

Plaintiffs also argue that the Singers breached their fiduciary duties to the McKennas through secret dealing with Westport. Plaintiffs identify nine communications between the Singers and Westport in which the McKennas were not included and argue that those communications constitute breaches of the duty of loyalty.[248] They cite this Court's opinion in *Hollinger International, Inc. v. Black*[249] in support of their position.

---

[247]   Even if Green Energy Companies did have an interest or expectancy in the opportunity (*cf. In re Digex S'holder Litig.*, 789 A.2d 1176, 1190-91 (Del. Ch. 2000)), the result is the same. Defendants also assert that Green Energy Companies was not financially able to exploit the opportunity at issue. If the opportunity at issue is the business plan to pursue oil-to-gas conversion financing, neither REF nor Green Energy Companies was financially able to pursue that opportunity without a substantial outside investment because both of those entities had essentially no assets. As such, the Singers were free to pursue it themselves. *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 155 (Del. 1996). The business plan became possible with an investment from Westport, but that investment did not include an equity interest for the McKennas.

[248]   Pls.' Opening Br. 39-41.

[249]   844 A.2d 1022, 1029 (Del. Ch. 2004).

"Delaware courts have long held that a certain duty to disclose inheres in the duty of loyalty."[250] For example, Chancellor Allen held in *Hoover Industries, Inc. v. Chase* that "[t]he intentional failure or refusal of a director to disclose to the board a defalcation or scheme to defraud the corporation of which he has learned, itself constitutes a wrong . . . ."[251] "But this duty to disclose is not a general duty to disclose everything the director knows about transactions in which the corporation is involved."[252] The Delaware cases addressing director disclosure typically deal with circumstances where the director is personally involved in transactions that are harmful to the corporation but beneficial to the director.[253] *Hollinger* has been recognized as "the paradigmatic example of this claim."[254]

In *Hollinger*, Hollinger International, Inc.'s ultimate controlling stockholder and chairman of the board Conrad M. Black "concealed from the [Hollinger] board [a potential buyer's] intense interest in acquiring [the Telegraph],"[255] which was a

---

[250] *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169, 1184 (Del. Ch. 2006), *abrogated on other grounds by N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92 (Del. 2007).

[251] *Hoover Indus., Inc. v. Chase*, 1988 WL 73758, at *2 (Del. Ch. July 13, 1988).

[252] *Big Lots*, 922 A.2d at 1184.

[253] *Id.*

[254] *Id.*

[255] *Hollinger*, 844 A.2d at 1061.

Hollinger asset. "Rather, Black took it upon himself to first reject that opportunity and later to divert that opportunity to [Hollinger's immediate controlling stockholder]."[256] "Black compounded this improper behavior by giving false assurances that he was honoring his obligations to [Hollinger] and not shopping [Hollinger's immediate controlling stockholder]."[257] The Court in *Hollinger* clarified that Black took these actions "under circumstances in which full disclosure was obviously expected . . . ."[258]

None of the communications between Westport and the Singers constitute a breach of fiduciary duty. Westport's primary interest was in partnering with Robison Energy, a company in which the McKennas had no interest, and the Westport opportunity made that clear from the first term sheet. The McKennas provided Westport with disclosure forms in March 2014, indicating that they did not own any equity in Robison Energy.[259] The secret communications Plaintiffs identify in their opening brief are from May through August 2014. By May 2014, the McKennas were aware that the Westport opportunity was a Robison Energy opportunity, and Westport knew that the McKennas had no interest in Robison

---

[256] *Id.*

[257] *Id.*

[258] *Id.*

[259] JX 144; JX 145.

Energy. Westport and the Singers, thus, were free to deal without the McKennas regarding a Westport investment.[260]

Even in and after May 2014, the McKennas were aware of their position vis-a-vis Westport and the Singers. On May 15, 2014, Thomas sent Westport his and Garrett's proposed job descriptions, which anticipated that they would "[r]eport to partners"[261] as employees. In or around June 2014, Smith informed the McKennas that the deal was going to close, and if they wanted to be employed by Green Energy Companies, they should negotiate employment agreements.[262] And on July 2, 2014, Thomas drafted an email attempting to change the terms of the opportunity as presented because he and Garrett wanted capital accounts.[263] Further, Thomas received Smith's July 29, 2014, email suggesting that the parties "just form a new

---

[260] Plaintiffs' briefing emphasizes the August 26 and 27, 2014 emails between the Singers and Westport regarding the formation of GEC Holdings to close the deal between Westport and the Singers. Pls.' Answering Br. 1, 6. Plaintiffs argue that those emails are evidence of a breach of fiduciary duty. But for the reasons described above, the Singers were free to pursue an investment from Westport to the exclusion of the McKennas. And the McKennas received sufficient notice of the terms of the Westport deal to comply with the Singer's duty of disclosure. In *In re Digex Shareholder Litigation*, the Court of Chancery held on a preliminary injunction record that "defendants only had to give fair notice of the opportunity to Digex." 789 A.2d 1176, 1194 (Del. Ch. 2000). The McKennas had fair notice, as they were fully aware of the fact that Westport was pursuing a deal under which only Westport and SEG would have capital accounts.

[261] JX 170.

[262] Tr. 963-64 (Smith).

[263] JX 191.

58

company and be done with it."[264]  By the time the Singers and Westport were deciding to form GEC Holdings to facilitate the closing, the McKennas were fully aware of the Westport opportunity and of the fact that they had not been offered capital accounts in connection with that opportunity.  The only fact that was not disclosed to the McKennas was that the Singers actually closed a deal on the terms that the McKennas knew were offered months before.  Because Green Energy Companies had no interest or expectancy in the Westport investment and the McKennas were aware of that fact, the Singers had no obligation to tell the McKennas when and how they planned to close the deal with Westport.

As further support for my finding that the McKennas knew that the Westport opportunity belonged to Robison Energy, the evidence shows that throughout the course of the negotiations, the McKennas acted as negotiating counterparties with the Singers rather than as fiduciaries.  Westport wanted to invest in the Singers' operating business, Robison Energy, and to finance Robison Energy's oil-to-gas conversions; the Singers wanted to sell their business or refinance its debt; and the McKennas wanted to obtain an equity stake in the proposed financing arm of this new venture.  The Singers' and the McKennas' interests were opposed in the determination of the value of Robison Energy because the higher the value of

---

[264]     JX 213.

Robison Energy, the greater the Singers' capital account would be and the more the McKennas would have to contribute to obtain the same share.

Thomas's July 2, 2014 email[265] acknowledged that reality. He did not want his equity stake to be tied to the value of Robison Energy,[266] but at the same time, he recognized that the parties' capital accounts were still being negotiated.[267] Garrett also acted as if his interests were opposed to the Singers' interests. He demanded, and the Kentros Group was paid, $20,000 for "investment banking consulting" services in April 2014.[268] And in August 2014, when Smith told Garrett that Westport was underwriting a bridge loan to Mount Hope but that Westport and Garrett needed to meet to discuss procedures for the program loans, Garrett responded that his interest was in how he was getting paid for his work.[269] Further, the McKennas had not offered to contribute any assets[270] and had never run the

---

[265]    JX 192.

[266]    *Id.* ("I am opposed to having any part of my equity aligned with the capital contribution based on the value of [Robison Energy].").

[267]    Tr. 50 (Thomas) ("[T]he capital account for the McKennas was going to be something that we wanted to negotiate and finalize with our negotiations with Westport.").

[268]    JX 47.

[269]    JX 237.

[270]    Tr. 166 (Thomas).

operations of a bank or lending company before,[271] but they demanded a seat on the Green Energy Companies board for themselves.[272] Such behavior shows that the McKennas were negotiating as counterparties to the Singers and did not consider themselves to be in a fiduciary relationship with the Singers with respect to the Westport investment. These facts starkly contrast with the facts of *Hollinger*, where Black affirmatively gave assurances that he was acting as a fiduciary, and they support my finding that the McKennas were aware that the Westport opportunity was focused on Robison Energy. Plaintiffs, thus, failed to prove the breach of fiduciary duty claims in counts I and V.

## C. Plaintiffs' Aiding and Abetting and Civil Conspiracy Claims Fail

In counts III and VII, Plaintiffs allege aiding and abetting in breach of fiduciary duty claims against Westport, GEC Holdings, and SEG for aiding and abetting in the Singers' breach of fiduciary duty. In counts IV and VIII, Plaintiffs allege claims for civil conspiracy against the same three Defendants for joining in confederation with the Singers to breach the Singers' fiduciary duties. To succeed on a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must prove "'(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by the defendants,' and (4) damages

---

[271] *Id.* at 94; *id.* at 477 (Garrett).

[272] JX 197.

61

proximately caused by the breach."[273]   To prove civil conspiracy, the following elements are required, "(1) the existence of a confederation or combination of two or more persons; (2) that an unlawful act was done in furtherance of the conspiracy; and (3) that the conspirators caused actual damage to the plaintiff."[274]   Because Plaintiffs did not prove the underlying breach of fiduciary duty claims brought on behalf of REF and Green Energy Companies, Plaintiffs' aiding and abetting and conspiracy claims in counts III, IV, VII, and VIII also fail.

### D.  Plaintiffs' Unjust Enrichment Claims Fail

Plaintiffs also assert unjust enrichment claims in counts II and VI to recover for any benefits the McKennas provided to the Defendants without compensation. The elements of an unjust enrichment claim are "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[275]

Even though the Singers and Westport decided not to employ the McKennas in the GEC Holdings venture, they arguably received some value from the McKennas during the negotiation process.  For example, the McKennas attended

---

[273]   *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (quoting *Penn Mart Realty Co. v. Becker*, 298 A.2d 349, 351 (Del. Ch. 1972)).

[274]   *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1036 (Del. Ch. 2006).

[275]   *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 58 (Del. Ch. 2012).

meetings with prospective vendors for Green Energy Companies,[276] and Garrett gathered certain diligence documents from Mount Hope.[277]

The McKennas were compensated for their services in April 2014 when Garrett sent an invoice for "investment banking consulting" to Robison Energy for $20,000, which Robison Energy paid to the Kentros Group, an entity that Thomas and Garrett control.[278] The evidence does not show whether that $20,000 covered past or future "investment banking consulting" services, and the parties' briefing does not clearly identify what services the McKennas seek to be compensated for. Additionally, the McKennas put forth damages evidence related to the value of GEC Holdings, but the proper calculation of damages, if there are any, is the fair market value of the McKennas' services minus the $20,000 they were paid. The record contains no evidence sufficient to allow this Court to conclude what value to place on those services. Thus, Plaintiffs have not carried their burden of establishing an unjust enrichment and did not prove counts II or VI.[279]

---

[276]    Tr. 963 (Smith).

[277]    *Id.* at 1062 (David).

[278]    JX 47.

[279]    Defendants also argue that even if Plaintiffs did otherwise prove their breach of fiduciary duty, aiding and abetting, conspiracy, and unjust enrichment claims, they failed to prove damages because Plaintiffs' damages expert report suffers from serious flaws. I need not address those arguments, however, because I hold that the McKennas failed to prove liability on their claims.

63

### E. Counterclaim Plaintiffs Failed to Prove an Actionable Fraudulent Misrepresentation

Daniel, David, and SEG allege in a counterclaim that the McKennas fraudulently induced them to build a financing business together and to fund work on the Mount Hope oil-to-gas conversions. To prove a claim for fraudulent misrepresentation, a party must prove:

> 1) the existence of a false representation, usually one of fact, made by the defendant; 2) the defendant had knowledge or belief that the representation was false, or made the representation with requisite indifference to the truth; 3) the defendant had the intent to induce the plaintiff to act or refrain from acting; 4) the plaintiff acted or did not act in justifiable reliance on the representation; and 5) the plaintiff suffered damages as a result of such reliance. In addition to overt representations, fraud may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak.[280]

The Counterclaim Plaintiffs argue that the McKennas falsely represented their professional experience. Thomas led the Singers to believe that he had financed geothermal conversions at Barnhardt[281] when in fact he had not.[282] And he led them to believe that Garrett had extensive experience in banking and had a great ability to raise funds for new ventures through his network of contacts. But Garrett had only

---

[280]   *Kronenberg v. Katz*, 872 A.2d 568, 585 n.25 (Del. Ch. 2004).

[281]   JX 162.

[282]   Tr. 104 (Thomas) ("Q. You never financed the costly installation of any geothermal energy systems, did you? A. No, we didn't.").

64

three and a half years' experience as an intern and loan originator at Merrill Lynch and J.P. Morgan[283] and had been fired by his subsequent employers Merriman Capital and Wealth Partners Capital.[284] Counterclaim Plaintiffs also contend that Garrett falsely represented that Mount Hope was financeable and that Garrett had completed the underwriting for the Mount Hope project.[285] The Singers and SEG contend that they relied to their detriment on the McKennas' misrepresentations regarding their experience by forming Delaware entities with them and entrusting them to establish a lending platform for Robison Energy. Additionally, the Singers and SEG claim that they relied on Garrett's misrepresentations regarding Mount Hope by agreeing to move forward with the Mount Hope oil-to-gas conversions.[286]

The Singers did form Delaware entities REF and Green Energy Companies with the McKennas in reliance on the McKennas' misrepresentations regarding their experience. But the monetary damages Counterclaim Plaintiffs seek relate only to

---

[283]  *Id.* at 233-34 (Garrett).

[284]  *Id.* at 465.

[285]  JX 221. The Counterclaim Defendants argue that the Counterclaim Plaintiffs did not adequately plead a claim regarding the alleged Mount Hope misrepresentations because the Verified Counterclaim does not mention Mount Hope. But the Counterclaim Defendants opened the door to the facts of the Mount Hope deal in the Verified Complaint (Compl. ¶¶ 25-26) and were on notice before the trial that this evidence would be presented (*McKenna v. Singer*, C.A. No. 11371-VCMR, at 26 (Del. Ch. Nov. 9, 2016) (TRANSCRIPT)).

[286]  Defs.' Opening Br. 56.

Mount Hope.[287]  The Singers and SEG do not point to any other quantifiable damages that arose from forming REF and Green Energy Companies.  The Verified Counterclaim seeks rescission of any contracts entered in reliance on the McKennas' misrepresentations, but none of the parties' summary judgment or post-trial briefs address rescission or any remedy other than monetary damages.[288]

As to the lending platform for Robison Energy, soon after the Singers began negotiating with Westport, they made clear that they were relying on Westport, not the McKennas, for financial expertise.[289]  On May 14, 2014, Smith wrote to the Singers and stated in reference to Garrett's loan origination plan, "Frankly, they are pretty pictures, but they don't come close to setting forth a plan detailed [enough] to meet the actual demands of the business of originating these loans as I have laid out here."[290]  In response, Daniel indicated that the Singers were relying on Westport for a loan origination plan.  He wrote, "As David and I have said many times, we are leaning on you for this part of the business model.  I think the McKenna's [sic] have put in the time that has earned them an uncontested first shot."[291]  The Singers did

---

[287]    *Id.* at 57-58.

[288]    *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[289]    JX 168.

[290]    *Id.*

[291]    *Id.*

not have a sophisticated understanding of finance, and they did rely on the advice of others. But because Westport took over the establishment of a financing program for GEC Holdings and provided the Singers with financial expertise, the Singers failed to prove that they relied on the McKennas misrepresentations in establishing a lending program.

Regarding the decision to move forward with Mount Hope, Counterclaim Plaintiffs failed to prove that they relied on the McKennas' misrepresentations. On August 5, 2014, Thomas stated to Smith and Socaransky that Mount Hope needed a $500,000 draw down to get through the heating season. He wrote, "Garrett has underwritten the financials,"[292] which Counterclaim Plaintiffs assert was a misrepresentation. But the Singers were not included on that email. Twenty minutes later, Smith responded and included the Singers on copy. He wrote, "We haven't done ANY underwriting yet. That's the purpose of the term sheet. To get the applicant committed so we can perform our due diligence."[293] And later that day, Garrett further corrected the record by sending an email to the Singers and Westport, which stated that "[t]he only review of the deal [that] has been done was a savings calculation for last winter."[294] The Singers, thus, could not have relied on Thomas's

---

[292] JX 221.

[293] *Id.*

[294] JX 223.

misrepresentation because they did not see it until it was corrected by Smith's subsequent email. Further, Smith wrote to the McKennas and the Singers on August 25, 2014, stating that "even though [the Mount Hope loan is] being propped as a GEC Finance deal, this is a one-off bridge loan being funded by Westport. Westport is underwriting this deal . . . . Westport knows how to do this, and it isn't going to fit the model for ordinary course loans."[295] SEG remained a solvent business only because of Westport's investment. The evidence shows that by the time of SEG's alleged reliance on the McKennas' misrepresentations, SEG and the Singers were relying only on Westport for financial expertise. Any harm to the Singers or SEG relating to Mount Hope was in reliance on Westport's underwriting and expertise, not the McKennas' representations.[296] The Counterclaim Plaintiffs, thus, failed to prove their fraudulent misrepresentation counterclaim.

## F. The Defendants' Request for Fee Shifting Is Denied

The McKennas request attorneys' fees for bad faith litigation conduct, and the Singers reserve their right to seek attorneys' fees later. In order to warrant the Court's departure from the American Rule requiring each party to bear its own costs

---

[295] JX 237; *see also* JX 207; JX 209.

[296] Notably, no funds were advanced for the Mount Hope projects until August 2014 by which time the Counterclaim Plaintiffs were relying on Westport for financial expertise. JX 237; JX 229 (Robison Energy August 2014 term sheet for a $2,500,000 loan to Mount Hope). And no work was performed on the Mount Hope conversions until November 2014. JX 278.

and fees, Plaintiffs must show that Defendants "'unnecessarily required the institution of litigation, delayed the litigation, and asserted frivolous motions,' or, put another way, [that] [D]efendants' bad faith has 'made the procession of the case unduly complicated and expensive.'"[297] But no litigation conduct in this case rose to the level of bad faith. The McKennas point to the fact that the Singers' summary judgment motion was denied without an argument as evidence of bad faith. But that a motion is denied does not mean that the motion was filed in bad faith. And the parties used their summary judgment briefs in place of pre-trial briefing, which saved the McKennas from a substantial additional expense. As such, each party will bear its own attorneys' fees.

## III. CONCLUSION

For the reasons stated herein, judgment is entered for the Defendants and against the Plaintiffs on counts I through VIII of the complaint. And judgment is entered for the Counterclaim Defendants and against the Counterclaim Plaintiffs on their misrepresentation counterclaim. All parties will bear their own attorneys' fees.

**IT IS SO ORDERED.**

---

[297] *Fairthorne Maint. Corp. v. Ramunno*, 2007 WL 2214318, at *9 (Del. Ch. July 20, 2007) (quoting *Johnston v. Arbitrium (Cayman Islands) Handels*, 720 A.2d 542, 546 (Del. 1998); *ATR-Kim Eng Fin. Corp. v. Araneta*, 2006 WL 3783520, at *23 (Del. Ch. 2006)).